EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Consejo de Titulares del Condominio Parques de Cupey; Attenure Holdings Trust 11; HRH Property Holdings<br><br>Recurridos<br><br>v.<br><br>Triple-S Propiedad, Inc.<br><br>Peticionaria | Certiorari<br><br>2025 TSPR 82<br><br>216 DPR ___ |

Número del Caso: CC-2024-0096

Fecha: 15 de agosto de 2025

Tribunal de Apelaciones:

Panel XI

Representantes legales de la parte peticionaria:

Lcdo. Luis R. Román Negrón
Lcdo. José D. Casillas Guevara

Representantes legales de la parte recurrida:

Lcda. Karina Montes Berríos
Lcda. Paola M. Torres Rodríguez
Lcda. Hedy I. Nieves Crespo

Materia: Derecho de Seguros; Derecho Procesal Civil y Evidencia – Descubrimiento del expediente de suscripción de la póliza y de la reserva de pérdida establecida por una aseguradora en virtud del Código de Seguros de Puerto Rico cuando se alega que la aseguradora actuó de mala fe durante el manejo y ajuste de la reclamación.

Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Consejo de Titulares del Condominio Parques de Cupey; Attenure Holdings Trust 11; HRH Property Holdings<br><br>Recurridos<br><br>v.<br><br>Triple-S Propiedad, Inc.<br><br>Peticionaria | CC-2024-96 | *Certiorari* |

El Juez Asociado Señor Feliberti Cintrón emitió la Opinión del Tribunal.

En San Juan, Puerto Rico, a 15 de agosto de 2025.

Nos corresponde determinar si, en el contexto de una reclamación por incumplimiento de contrato de seguro de propiedad, procede el descubrimiento del expediente de suscripción de la póliza y de la reserva de pérdida establecida por una aseguradora en virtud del Código de Seguros de Puerto Rico (Código de Seguros), 26 LPRA sec. 101 *et seq.* Lo anterior surge tras el asegurado haber alegado que la aseguradora actuó de mala fe durante el manejo y ajuste de la reclamación.

Por considerar que el descubrimiento de prueba antes mencionado es incompatible con la finalidad de un litigio sobre cobertura y que incide con el postulado que busca garantizar una solución justa, rápida y económica de todo procedimiento civil, adelantamos que contestamos en la negativa la interrogante planteada.

A continuación, exponemos el trasfondo fáctico y procesal que dio origen al presente caso.

I

El 16 de septiembre de 2019, el Consejo de Titulares del Condominio Parques de Cupey, Attenure Holdings Trust 11 y HRH Property Holdings (en conjunto, Consejo de Titulares o recurridos) presentaron una *Demanda* sobre incumplimiento de contrato y daños y perjuicios en contra de Triple-S Propiedad, Inc. (Triple-S o peticionaria) tras surgir una controversia contractual relacionada con la cobertura de la póliza de seguro. En síntesis, los recurridos alegaron que la peticionaria no investigó ni ajustó adecuadamente una reclamación que hizo el Consejo de Titulares, como asegurado, por los daños sufridos en el condominio luego del paso de los huracanes Irma y María. En particular, los recurridos adujeron que Triple-S se negó a cumplir con sus obligaciones contractuales y actuó mediante dolo y mala fe al no proveer una compensación justa por los daños que sufrió la propiedad.[1] En vista de ello, el Consejo de Titulares sostuvo que la peticionaria incumplió con el contrato de seguros que cobijaba al condominio, por lo cual reclamó el pago de $14,706,508.49 por incumplimiento de contrato y daños contractuales, costas y honorarios de abogado.

---

[1] *Demanda*, Apéndice del *certiorari*, págs. 8, 11-12.

Por su parte, el 15 de julio de 2020, Triple-S presentó una *Contestación a demanda*. En resumen, negó las alegaciones sobre las presuntas prácticas desleales e incumplimiento de contrato. Asimismo, afirmó que había actuado de forma diligente y de buena fe durante el proceso de ajuste de la reclamación y en cumplimiento con las disposiciones del contrato de seguro otorgado por las partes.[2] Entre sus defensas afirmativas, la peticionaria adujo que los recurridos incurrieron en fraude y falsas representaciones y que los daños reclamados eran excesivos, especulativos e inexistentes.[3]

Durante la etapa del descubrimiento de prueba, el Consejo de Titulares cursó a Triple-S un *Primer pliego de interrogatorios* y un *Requerimiento para la producción de documentos*. En lo pertinente, entre otra información, solicitó que la peticionaria indicara "la cantidad de reserva o reserva de pérdida asignada para la [r]eclamación [del Consejo de Titulares]", así como "todos los [d]ocumentos relacionados a las reservas de pérdida para la [r]eclamación"; y la producción del "expediente completo de [suscripción o] *underwriting* […] de la [p]óliza de [s]eguro".[4]

---

[2]  *Contestación a demanda*, Apéndice del *certiorari*, pág. 31.

[3]  Íd., pág. 46.

[4]  Valga señalar que el Consejo de Titulares del Condominio Parques de Cupey, Attenure Holdings Trust 11 y HRH Property Holdings (en conjunto, Consejo de Titulares o recurridos) formularon las siguientes preguntas:

  "[Interrogatorio Núm.] 12[:] Indique y describa cada política o proceso establecido previo a otorgar una póliza de seguros, y si la propiedad que ha de asegurarse debe inspeccionarse

En respuesta, Triple-S presentó su *Contestación a primer pliego de interrogatorios* y *Contestación a requerimiento para la producción de documentos* en la que informó sus contestaciones y objeciones al descubrimiento solicitado. Particularmente, objetó la producción de los documentos e información sobre las reservas de pérdidas para la reclamación, así como los procesos de suscripción de la póliza por ser información impertinente, excesivamente amplia y no tener una probabilidad razonable de conducir a

---

como parte del proceso de *underwrit[]ing*. Describa cómo debe ser dicha inspección, quiénes la llevan a cabo y cómo la documentan.

[Interrogatorio Núm.] 13[:] Identifique a cada persona que participó o estuvo involucrada en [el] *underwrit[]ing* de la Póliza de Seguros.

[Interrogatorio Núm.] 14[:] Identifique y describa c[ó]mo ha cambiado desde el 2016 al presente el proceso establecido por usted previo a otorgar una póliza de seguros, incluyendo si la propiedad que ha de asegurarse debe inspeccionarse como parte del proceso de *underwrit[]ing*.

[…]

[Interrogatorio Núm.] 29[:] Indique cuál es la cantidad de reserva o reserva de pérdida asignada para la Reclamación.

[…]

[Requerimiento Núm.] 9[:] Identifique y produzca todos los Documentos y Comunicaciones relacionados con la Póliza de Seguro o el Asegurado. Este requerimiento incluye todos los Documentos relacionados a los borradores, anejos, endosos, "*underwrit[]ing*", renovaciones, extensiones, o emisión de la Póliza de Seguro del Asegurado, al igual que su expediente completo de "*underwrit[]ing*", todas las aplicaciones o solicitudes, información sobre historial de pérdida, todos los Documentos recibidos del Asegurado o sus agentes, y todos los Documentos que contengan información que Usted usó, generó, refirió, revisó o descansó en el curso del proceso de "*underwrit[]ing*" de la Póliza de Seguro.

[…]

[Requerimiento Núm.] 40[:] Identifique y produzca todos los Documentos relacionados a las reservas de pérdida para la Reclamación".

*Primer pliego de interrogatorios* presentado por el Consejo de Titulares el 23 de septiembre de 2022, Apéndice del *certiorari*, págs. 59-60; *Requerimiento para la producción de documentos* presentado por los recurridos el 23 de septiembre de 2022, Apéndice del *certiorari*, págs. 78, 83.

prueba admisible.[5] Además, señaló que lo solicitado procuraba la divulgación de información confidencial, es

---

[5] Resulta pertinente señalar que Triple-S Propiedad Inc. (Triple-S o peticionaria) objetó varias preguntas contenidas en el interrogatorio y requerimiento cursado al Consejo de Titulares, a saber:

"Contestación al Interrogatorio Núm. 12: Se objeta el Interrogatorio Núm. 12 por ser impertinente a las controversias y porque no tiene una probabilidad razonable de conducir a prueba admisible. No existe ninguna controversia en relación con la existencia de la póliza y su contenido, por lo que la información solicitada no es pertinente. Además, se objeta en la medida que solicita información sobre la suscripción y *underwriting* de la Póliza, que es información confidencial que constituye un secreto de negocios, no sujeto al descubrimiento de prueba al amparo de la Regla 513 de Evidencia.

Contestación al Interrogatorio Núm. 13: Se objeta el Interrogatorio Núm. 13 por ser impertinente a las controversias y porque no tiene una probabilidad razonable de conducir a prueba admisible. No existe ninguna controversia en relación con la existencia de la póliza y su contenido, por lo que la información solicitada no es pertinente. Además, se objeta en la medida que solicita información sobre la suscripción y *underwriting* de la Póliza, que es información confidencial que constituye un secreto de negocios, no sujeto al descubrimiento de prueba al amparo de la Regla 513 de Evidencia.

Contestación al Interrogatorio Núm. 14: Se objeta el Interrogatorio Núm. 14 por ser impertinente a las controversias y porque no tiene una probabilidad razonable de conducir a prueba admisible. No existe ninguna controversia en relación con la existencia de la póliza y su contenido, por lo que la información solicitada no es pertinente. Además, se objeta en la medida que solicita información sobre la suscripción y *underwriting* de la Póliza, que es información confidencial que constituye un secreto de negocios, no sujeto al descubrimiento de prueba al amparo de la Regla 513 de Evidencia.

[…]

Contestación al Interrogatorio Núm. 29: Se objeta el Interrogatorio Núm. 29 en la medida que solicita información impertinente que no tiene una probabilidad razonable de conducir a prueba admisible. Además, se objeta en la medida que solicita información confidencial que constituye un secreto de negocios, no sujeto a descubrimiento de prueba al amparo de la Regla 513 de Evidencia.

[…]

Contestación al Requerimiento Núm. 9: Se objeta este requerimiento por vaguedad, ser excesivamente amplio, oneroso, e impertinente a las controversias del caso y que no tiene una probabilidad razonable de conducir a prueba admisible. Además, se objeta en la medida que solicita información confidencial que podría constituir un secreto de negocios, no sujeto a descubrimiento de prueba al amparo de la Regla 513 de Evidencia.

decir, secretos comerciales o de negocios protegidos por la Regla 513 de las Reglas de Evidencia de Puerto Rico (Reglas de Evidencia), 32 LPRA Ap. VI, R. 513.

Ante la alegada insuficiencia de las contestaciones notificadas por la peticionaria, los recurridos remitieron una comunicación a la referida aseguradora para coordinar una reunión, discutir sus respectivas objeciones y realizar esfuerzos adicionales en cumplimiento con lo dispuesto en la Regla 34.1 de las Reglas de Procedimiento Civil de 2009 (Reglas de Procedimiento Civil), 32 LPRA Ap. V. Más adelante, la peticionaria envió al Consejo de Titulares una carta en la cual reiteró sus objeciones e incluyó una producción suplementaria de documentos.

Así las cosas, el Consejo de Titulares presentó una *Moción en solicitud de orden para compeler a [la] parte demandada a descubrir prueba pertinente y no privilegiada*. En lo pertinente a la controversia que nos atañe, solicitaron al Tribunal de Primera Instancia que ordenara a Triple-S descubrir e identificar el expediente y el proceso de suscripción de la póliza, así como la

---

[…]

Contestación a Requerimiento Núm. 40: Se objeta este requerimiento por vaguedad, ser excesivamente amplio e impertinente a las controversias del caso y que no tiene una probabilidad razonable de conducir a prueba admisible. Además, se objeta por requerir información confidencial que podría constituir secreto de negocios, no sujeto a descubrimiento al amparo de la Regla 513 de las Reglas de Evidencia, 32 LPRA Ap. VI, R. 513".

*Contestación a primer pliego de interrogatorios* presentada por Triple-S el 9 de diciembre de 2022, Apéndice del *certiorari*, págs. 95-96, 102, y *Contestación a requerimiento para la producción de documentos* presentada por Triple-S el 9 de diciembre de 2022, Apéndice del *certiorari*, págs. 123, 131.

información sobre las reservas de pérdidas relacionadas con la reclamación del Consejo de Titulares.[6] Los recurridos arguyeron que dicha información era pertinente, pues sustentaba las alegaciones contenidas en la *Demanda* sobre incumplimiento de contrato, mala fe y manejo inadecuado de la reclamación. A su vez, señalaron que la información solicitada no constituía un secreto comercial, así como tampoco estaba protegida por algún privilegio.

Por su parte, la peticionaria se opuso a la solicitud bajo el fundamento de que en la jurisprudencia de otros estados se ha determinado que la información sobre el proceso de suscripción carece de pertinencia para establecer la buena o mala fe de una aseguradora en el manejo y proceso de ajuste de una reclamación.[7] En esa misma línea argumentativa, Triple-S manifestó que la información sobre las reservas también era impertinente, pues no constituía evidencia de cobertura o responsabilidad.[8] Además, aseveró que dicha información era información confidencial al amparo del Art. 53.080 del Código de Seguros, 26 LPRA sec. 4538; la Ley Núm. 80-2011, según enmendada, conocida como Ley para la protección

---

[6] *Moción en solicitud de orden para compeler a [la] parte demandada a descubrir prueba pertinente y no privilegiada* presentada por los recurridos el 15 de agosto de 2023, Apéndice del *certiorari*, pág. 196.

[7] *Oposición a "moción en solicitud de orden para compeler a [la] parte demandada a descubrir prueba pertinente y no privilegiada"* presentada por Triple-S el 31 de agosto de 2023, Apéndice del *certiorari*, pág. 373.

[8] *Íd.*, pág. 382.

de secretos comerciales e industriales de Puerto Rico (Ley Núm. 80-2011), 10 LPRA sec. 4131 *et seq.*, y la Regla 513 de las Reglas de Evidencia, *supra*.[9]

Tras evaluar ambos escritos, el 2 de septiembre de 2023, el Tribunal de Primera Instancia emitió una *Orden*, en la cual autorizó la producción de cierta información que entendió era descubrible. No obstante, el referido foro resolvió que la documentación requerida sobre la suscripción no era pertinente, ya que la validez, la cubierta y la vigencia de la póliza no estaban en controversia. Del mismo modo, el foro ´primario determinó que la información sobre las políticas, prácticas y procedimientos utilizados por la peticionaria, entre la cual se encontraba la reserva de pérdida de la reclamación, era inmaterial e impertinente a la controversia del caso, por lo cual estimó que dicha solicitud constituía una "expedición de pesca".[10]

Inconforme, el Consejo de Titulares presentó una *Moción de reconsideración parcial* el 20 de septiembre de 2023. Por su parte, Triple-S presentó su oposición a la misma el 5 de octubre de 2023. Evaluadas las comparecencias de las partes, el Tribunal de Primera Instancia proveyó no ha lugar a la *Moción de reconsideración parcial* mediante una *Orden* emitida el 6 de octubre de 2023.

---

[9] Íd., pág. 384.

[10] *Orden* del Tribunal de Primera Instancia emitida el 2 de septiembre de 2023, Apéndice del *certiorari*, pág. 388.

En desacuerdo con este resultado, los recurridos presentaron una *Petición de certiorari* ante el Tribunal de Apelaciones el 6 de noviembre de 2023. En resumen, adujeron que el foro primario erró y abusó de su discreción al denegar el descubrimiento de prueba cursado a la peticionaria. Por su parte, el 29 de noviembre de 2023, Triple-S presentó una *Oposición a petición de certiorari civil* en la cual reiteró sus argumentos.

Así las cosas, el foro apelativo intermedio emitió una *Sentencia* el 19 de diciembre de 2023, mediante la cual revocó parcialmente la *Orden* del Tribunal de Primera Instancia. En lo pertinente, el Tribunal de Apelaciones determinó que el foro primario debió permitir el descubrimiento de las reservas relacionadas con la reclamación del Consejo de Titulares. Razonó que esta información era pertinente a la reclamación presentada, "específicamente, en cuanto a las alegaciones de dolo, mala fe y la cobertura de la póliza de seguro".[11] Del mismo modo, determinó que la información sobre la suscripción de la póliza era pertinente ya que Triple-S había alegado como defensa afirmativa la existencia de fraude tras la reclamación de unos daños que presuntamente no fueron ocasionados por el Huracán María.

Insatisfecha con el dictamen del foro apelativo intermedio, el 3 de enero de 2024, la peticionaria presentó

---

[11] *Sentencia* del Tribunal de Apelaciones emitida el 19 de diciembre de 2023, Apéndice del *certiorari*, pág. 497.

una *Moción de reconsideración parcial*, la cual fue declarada no ha lugar mediante una *Resolución* emitida el 19 de enero de 2024.

Aun en desacuerdo, Triple-S presentó una *Petición de certiorari* ante este Tribunal el 21 de febrero de 2024, mediante la cual esbozó los señalamientos de error siguientes:

**Primer error**: Erró el Tribunal de Apelaciones al revocar al [Tribunal de Primera Instancia] y al ordenar a Triple-S a producir información y documentos relacionados con las reservas del caso, pese a que dicha documentación no es pertinente ni conducirá razonablemente al descubrimiento de evidencia pertinente.

**Segundo error**: Erró el Tribunal de Apelaciones al revocar al [Tribunal de Primera Instancia] y al ordenar a Triple-S a producir información y documentos relacionados con las reservas del caso, pese a que dicha documentación es privileg[i]ada bajo el Código de Seguros, bajo el privilegio de secretos de negocio, y bajo la Regla 505 de evidencia.

**Tercer error**: Erró el Tribunal de Apelaciones al intervenir con lo resuelto por el [Tribunal de Primera Instancia], a pesar de que el Condominio [Parques de Cupey] no demostró que el foro primario haya incurrido en pasión[,] prejuicio, parcialidad o error manifiesto.

En reconsideración, expedimos el recurso de *certiorari* solicitado por la peticionaria mediante una *Resolución* emitida el 31 de mayo de 2024. Como parte del trámite procesal de este recurso, el 7 de agosto de 2024, Triple-S presentó su alegato. En esencia, reiteró que la información relacionada a la reserva no debía ser objeto del descubrimiento de prueba debido a que era impertinente para resolver una reclamación de seguro o para probar la

mala fe de la aseguradora en el manejo de la reclamación. Precisó en su análisis que la información solicitada era de carácter confidencial y, a su vez, secretos del negocio al amparo del Art. 53.080 del Código de Seguros, *supra*, la Ley Núm. 80-2011 y la Regla 513 de las Reglas de Evidencia, *supra*. Además, la peticionaria planteó que la información sobre las reservas estaba protegida por la doctrina del producto del trabajo (*work product*), según lo reconocía la Regla 505 de las Reglas de Evidencia, 32 LPRA Ap. VI, R. 505.

Los recurridos, por su parte, presentaron su *Alegato en oposición* el 6 de septiembre de 2024. En su escrito, expusieron, entre varios asuntos, que, en el contexto de una reclamación donde se alega dolo y mala fe por parte de la aseguradora, el descubrimiento de prueba sobre las reservas era pertinente. Consecuentemente, solicitaron que denegáramos la expedición del *certiorari*.

El 10 de septiembre de 2024 el caso quedó sometido en los méritos. Posteriormente, Triple-S y el Consejo de Titulares comparecieron conjuntamente ante este Foro para solicitar la paralización de los procedimientos mientras sostenían conversaciones transaccionales para resolver el pleito extrajudicialmente. En específico, la peticionaria y los recurridos acudieron ante este Tribunal en tres (3) ocasiones diferentes para solicitar y subsiguientemente extender la paralización del caso con la intención de agotar los esfuerzos transaccionales. Dichas prórrogas

les fueron concedidas según solicitadas y <u>procedimos a paralizar el trámite apelativo ante nosotros unos ciento veinticinco (125) días aproximadamente, lo que resulta en exceso de cuatro (4) meses</u>. No obstante, mediante una *Moción informativa conjunta sobre conversaciones transaccionales* presentada el 26 de febrero de 2025, las partes solicitaron que se retomaran los procedimientos del caso, pues ya no se encontraban participando activamente en las negociaciones. Luego, la Asociación de Compañías de Seguros de Puerto Rico (Asociación) compareció ante nos el 21 de marzo de 2025 a través de una *Moción solicitando autorización para comparecer como amicus curiae*. Mediante una *Resolución* emitida el 31 de marzo de 2025, este Tribunal declaró ha lugar la solicitud para reanudar los procedimientos del presente caso y proveyó no ha lugar a la solicitud de la Asociación para comparecer como *amicus curiae*.

Cabe señalar que, anteriormente, las partes han recurrido a los tribunales para presentar las controversias planteadas en este caso (es decir, si procede el descubrimiento del expediente de suscripción de una póliza de seguros, al igual que el revelar la reserva de pérdida establecida por la aseguradora) para luego abandonar el asunto al final del camino. **Esta práctica de solicitar numerosas prórrogas y de mantener el asunto paralizado por meses bajo la "justificación de realizar esfuerzos para alcanzar un acuerdo transaccional", mueve innecesariamente la maquinaria de la justicia, con el tiempo y costo que ello**

**envuelve para las partes, evadiendo así nuestros pronunciamientos al respecto**.

Para sorpresa nuestra, el 23 de julio de 2025, <u>luego de haber transcurrido unos cinco (5) meses desde que las partes nos solicitaran retomar los procedimientos en el caso por no haber podido alcanzar una transacción</u>, las partes presentaron una <u>cuarta solicitud de prórroga</u> mediante una <u>nueva</u> *Moción informativa conjunta sobre conversaciones transaccionales* donde solicitaron un <u>nuevo</u> término de sesenta (60) días para continuar negociaciones transaccionales. Según indicaron en dicha moción, <u>las partes "solicitan que los procedimientos en el presente caso sean paralizados por un [nuevo] término [de] sesenta (60) días</u> en aras de permitir[les] continuar las negociaciones", y nos informan que "mantienen su compromiso de informar a este Tribunal tan pronto las negociaciones alcancen una resolución satisfactoria **o, en su defecto, para solicitar la reanudación de los procedimientos**". (Negrilla y subrayado suplidos). Véanse párrafos 6 y 7 a la pág. 2 de la moción. A dicha solicitud este Tribunal provee *No Ha Lugar*. **Debe quedar meridianamente claro que el manejo de los casos lo controlan los tribunales y los jueces, y no las partes. Estas últimas están en todo su derecho de transar un caso, pero no para contar con la concesión de prórrogas ilimitadas para ello.**

En vista a lo anteriormente indicado, y con el beneficio de las comparecencias de las partes, procedemos a resolver exponiendo el derecho aplicable.

## II

### A. El alcance del descubrimiento de prueba

Es doctrina reiterada por este Tribunal que el descubrimiento de prueba debe ser amplio y liberal. Izquierdo II v. Cruz y otros, 213 DPR 607, 616 (2024); Rivera *et al.* v. Arcos Dorados *et al.*, 212 DPR 194, 203 (2023); Cruz Flores *et al.* v. Hosp. Ryder *et al.*, 210 DPR 465, 496 (2022); McNeil Healthcare v. Mun. Las Piedras II, 206 DPR 659, 672 (2021); Rivera y otros v. Bco. Popular, 152 DPR 140, 152 (2000).

Asimismo, hemos expresado que los foros de primera instancia tienen amplia discreción para regular el proceso de descubrimiento de prueba, "pues es su obligación garantizar una solución justa, rápida y económica del caso, sin ventajas para ninguna de las partes".[12] Rivera *et al.* v. Arcos Dorados *et al.*, *supra*, págs. 203-204 (citando a Cruz Flores *et al.* v. Hosp. Ryder *et al.*, *supra*, págs. 496–497).

En vista de lo anterior, hemos resuelto que:

> [L]os foros apelativos **no hemos de interferir con los tribunales de instancia en el ejercicio de sus facultades discrecionales,** excepto en aquellas situaciones en que se demuestre que este último[:] (1) actuó con prejuicio o parcialidad, (2) incurrió en un craso abuso de discreción, o (3) se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo. (Énfasis suplido). Torres González

---

[12] A tales efectos, cabe señalar que el Tribunal de Primera Instancia tiene a su disposición imponer órdenes dirigidas a proteger a las partes u otras personas de hostigamiento, perturbación, opresión y gastos o molestias indebidas en el desarrollo del descubrimiento de prueba. Regla 23.2 de las Reglas de Procedimiento Civil de 2009 (Reglas de Procedimiento Civil), 32 LPRA Ap. V, R. 23.2; Ortiz Rivera v. E.L.A., National Ins. Co., 125 DPR 65, 70–71 (1989).

v. Zaragoza Meléndez, 211 DPR 821, 846 (2023)
(citando a Rivera y otros v. Bco. Popular, *supra*,
pág. 155).

Por otro lado, en nuestro ordenamiento, la Regla
23.1(a) de las Reglas de Procedimiento Civil,
32 LPRA Ap. V, establece los parámetros que regulan el
descubrimiento de prueba en los casos civiles.
En particular, el inciso (a) de esta Regla dispone que las
partes en litigio podrán indagar "sobre cualquier materia,
no privilegiada, que sea pertinente al asunto en
controversia en el pleito pendiente […]". Íd. Véase,
además, Cruz Flores *et al*. v. Hosp. Ryder *et al*., *supra*,
pág. 496.

Según puede apreciarse, al proceso de descubrimiento
le son oponibles únicamente dos limitaciones: **que el asunto
que se pretende descubrir sea pertinente a la controversia
que se dirime y que la materia que se pretende descubrir,
aunque sea pertinente, no sea de naturaleza privilegiada.**
Izquierdo II v. Cruz y otros, *supra*, págs. 616-617.
Con respecto a la pertinencia, hemos expresado que ésta
debe interpretarse en términos amplios. McNeil Healthcare
v. Mun. Las Piedras II, *supra*, pág. 674; E.L.A. v. Casta,
162 DPR 1, 12 (2004); General Electric v. Concessionaires,
Inc., 118 DPR 32, 40 (1986). Por lo que, "para que una
materia pueda ser objeto de descubrimiento, basta con que
exista una posibilidad razonable de relación con el asunto
en controversia". Torres González v. Zaragoza Meléndez,

*supra*, pág. 845 (citando a <u>Vincenti v. Saldaña</u>, 157 DPR 37, 54 (2002)).[13]

Sin embargo, es importante aclarar que, aunque amplio, ello no implica que el descubrimiento de prueba sea ilimitado y que constituya una carta en blanco que pueda usarse indiscriminadamente para hostigar, perturbar o hacer que una parte incurra en gastos innecesarios. <u>Torres González v. Zaragoza Meléndez</u>, *supra*, pág. 845. Es ahí cuando, en el ejercicio de su sana discreción, el Tribunal de Primera Instancia podrá limitar el alcance y los mecanismos que se utilizarán.[14]  <u>Íd.</u>, pág. 846. Esto,

---

[13]  Véase Regla 401 de las Reglas de Evidencia de Puerto Rico (Reglas de Evidencia), 32 LPRA Ap. VI.  La Regla 401 de las Reglas de Evidencia, *supra*, regula lo concerniente a la admisibilidad de la prueba y define el término "pertinente".  Esta corresponde al inciso (a) de la Regla 18 de Evidencia de 1979 y sigue el esquema de la sección 210 del Código de Evidencia de California.  Así pues, al interpretar la pasada Regla 18 de Evidencia, colegimos lo siguiente en cuanto al criterio para determinar si una prueba es pertinente:

> "[…] El concepto pertinencia exige que la evidencia que se pretenda usar sea material y relevante. Una prueba es material si va dirigida a establecer un hecho adjudicativo, es decir, se refiere a algún elemento de la reclamación, defensa o credibilidad de testigos o declarante. En el fondo es una cuestión de derecho sustantivo. Por su parte, la relevancia pertenece al ámbito de derecho procesal que busca que la prueba tenga una tendencia a hacer más o menos probable un hecho en controversia.
>
> Aunque la tendencia puede ser mínima, la admisibilidad de la prueba aún depende de su grado de valor probatorio versus el potencial de causar perjuicio indebido". (Citas omitidas). <u>Pres. del Senado</u>, 148 DPR 737, 766 esc. 24 (1999).

[14]  El tratadista José A. Cuevas Segarra menciona lo siguiente sobre la discreción del Tribunal de Primera Instancia para regular el descubrimiento de prueba:

> "[…] La tendencia es a limitarlo dentro de unos parámetros de razonabilidad y proporcionalidad, de manera que no continúe siendo uno de los motivos principales para la dilación en la adjudicación de las controversias. Más que una facultad, existe un deber que se le impone al Tribunal de Primera Instancia de actuar afirmativa y dinámicamente en la tramitación de los casos ante su consideración". (Citas omitidas). J.A. Cuevas Segarra, *Tratado de derecho*

además, es cónsono con el principio que rige las reglas procesales, a saber: "lograr la solución de las controversias de forma justa, rápida y económica". General Electric v. Concessionaires, Inc., *supra*, pág. 40. Así pues, **"el tribunal debe[rá] rechazar por impertinente toda pregunta que no tenga una posibilidad razonable de relación con el asunto en controversia"**. (Énfasis suplido). E.L.A. v. Casta, *supra*, pág. 14 (citando a Ortiz Rivera v. E.L.A., National Ins. Co., 125 DPR 65, 75 (1989)).

Por ejemplo, hemos expresado que la prueba pertinente es aquella que produzca o pueda producir, entre otras cosas:

> "[…] (a) prueba que sea admisible en el juicio; (b) hechos que puedan servir para descubrir evidencia admisible; (c) datos que puedan facilitar el desarrollo del proceso; (d) admisiones que puedan limitar las cuestiones realmente litigiosas entre las partes; (e) datos que puedan servir para impugnar la credibilidad de los testigos; (f) hechos que puedan usarse para contrainterrogar a los testigos de la otra parte; (g) nombres de los testigos que la parte interrogada espera utilizar en el juicio". McNeil Healthcare v. Mun. Las Piedras II, supra, pág. 674 (citando a Sierra v. Tribunal, 81 DPR 554, 573 esc. 10 (1959)). Véase, además, J.A. Cuevas Segarra, *El descubrimiento de prueba en la práctica procesal civil puertorriqueña*, Barcelona, Bosch Editor, 2023, pág. 107.

Por otro lado, en cuanto a la materia privilegiada hemos precisado que es aquella que puede ser excluida del descubrimiento ya sea por políticas extrínsecas o algún

---

*procesal civil*, 2da ed., Estados Unidos, Publicaciones JTS, 2011, Tomo III, págs. 837-838.

privilegio reconocido en las Reglas de Evidencia. McNeil Healthcare v. Mun. Las Piedras II, *supra*, pág. 674; Pres. del Senado, 148 DPR 737, 766 (1999). Por consideraciones de interés público, la materia privilegiada excluye actos, hechos o comunicaciones que de otra forma serían pertinentes y descubribles. McNeil Healthcare v. Mun. Las Piedras I, 206 DPR 391, 407 (2021); Ponce Adv. Med. v. Santiago González *et al.*, 197 DPR 891, 899 (2017). Véase, además, Pagán *et al.* v. First Hospital, 189 DPR 509, 518 (2013). Por tanto, en ausencia de un privilegio específicamente reconocido por nuestro ordenamiento jurídico, no procede objeción alguna bajo ese fundamento. Ponce Adv. Med. v. Santiago González *et al.*, *supra*, pág. 899. Véase, también, J.A. Cuevas Segarra, *Tratado de derecho procesal civil*, 2da ed., Estados Unidos, Publicaciones JTS, 2011, Tomo III, pág. 905.

En esa misma línea, hemos expresado que, con relación a la existencia y alcance de los privilegios, su concesión no será automática y su existencia se interpretará restrictivamente de forma que no entorpezca la consecución de la verdad en los procesos judiciales. Regla 518 de las Reglas de Evidencia, 32 LPRA Ap. VI; Ponce Adv. Med. v. Santiago González *et al.*, *supra*, págs. 899-900. A esos efectos, cuando una parte considere que posee cierta información o materia privilegiada, deberá, tan pronto se le solicite su descubrimiento:

> […] (1) objetar la producción de los documentos, las comunicaciones o los objetos requeridos;

(2) indicar expresamente el privilegio específico que pretende invocar; (3) exponer con particularidad los hechos concretos en los que se basa la aplicabilidad del privilegio; (4) fundar con claridad la existencia de los elementos legales del privilegio en cuestión, y (5) describir la naturaleza de la evidencia no producida de forma tal que, sin revelar la información privilegiada, permita a otras partes evaluar su reclamación. McNeil Healthcare v. Mun. Las Piedras I, *supra*, pág. 408 (citando a Ponce Adv. Med. v. Santiago González *et al.*, *supra*, pág. 900).

A la luz de lo anterior, prestaremos especial atención a los privilegios. Particularmente, evaluaremos los contornos jurídicos de la información privilegiada sobre secretos del negocio o secreto comercial.

**B. El proceso para invocar el privilegio de secretos del negocio o secreto comercial**

En armonía con el estado de derecho expuesto, la Regla 513 de las Reglas de Evidencia, *supra*, regula lo concerniente al privilegio de secretos del negocio. Dicho privilegio procura proteger toda información comercial que posea carácter confidencial. Ponce Adv. Med. v. Santiago González *et al.*, *supra*, págs. 901-902. Específicamente, la citada Regla 513 de las Reglas de Evidencia, *supra*, dispone lo siguiente:

La dueña o el dueño de un secreto comercial o de negocio tiene el privilegio -que podrá ser invocado por ella o por él o por la persona que es su agente o empleada- de rehusar divulgarlo y de impedir que otra persona lo divulgue, siempre que ello no tienda a encubrir un fraude o causar una injusticia. Si fuere ordenada su divulgación, el [t]ribunal deberá tomar aquellas medidas necesarias para proteger los intereses

de la dueña o del dueño del secreto comercial,
de las partes y de la justicia.[15]

Aun cuando la aludida Regla no define qué es un secreto comercial, en nuestra jurisdicción, la legislación especial que regula los aspectos sustantivos de los secretos del negocio, Ley Núm. 80-2011, *supra*, lo describe como información:

> (a) [d]e la cual se deriva un valor económico independiente, ya sea un valor actual o un valor potencial, o una ventaja comercial, debido a que tal información no es de conocimiento común o accesible por medios apropiados por aquellas personas que pueden obtener un beneficio pecuniario del uso o divulgación de dicha información; y

> (b) que ha sido objeto de medidas razonables de seguridad, según las circunstancias, para mantener su confidencialidad. Art. 3 de la Ley 80-2011, 10 LPRA sec. 4132.[16] Ponce Adv. Med. v. Santiago González *et al.*, *supra*, pág. 904.

---

[15] Cabe destacar que nuestras Reglas de Evidencia reconocen otros tipos de privilegios, entre estos, el producto del trabajo (*work product*). Regla 505(a)(2) de las Reglas de Evidencia, 32 LPRA Ap. VI. Dicho privilegio protege la "información que es el producto del trabajo de una parte o de la persona que es abogada, consultora, fiadora, aseguradora o agente de dicha parte, preparada u obtenida en anticipación de, o como parte de una investigación o procedimiento civil, administrativo o penal". Íd. Este privilegio "consiste de esa información que el abogado ha reunido y las impresiones mentales, teorías legales y estrategias que él persigue o ha adoptado, derivadas de entrevistas, declaraciones, memorándums, correspondencia, resúmenes, investigaciones de hechos o de derecho, creencias personales y otros medios tangibles o intangibles". McNeil Healthcare v. Mun. Las Piedras II, 206 DPR 659, 675 (2021) (citando a Casasnovas *et al.* v. UBS Financial *et al.*, 198 DPR 1040, 1056 (2017)).

[16] A modo ilustrativo, la Exposición de Motivos de la Ley Núm. 80-2011, conocida como Ley para la Protección de Secretos Comerciales e Industriales de Puerto Rico (Ley Núm. 80-2011), 10 LPRA sec. 4131 *et seq.*, ejemplificó que un secreto comercial puede "consistir en un proceso para manufacturar, tratar o preservar materiales, una fórmula o receta, un proyecto o patrón para el desarrollo de alguna maquinaria, o bien, simplemente una lista de clientes especializados y constitutivos de un mercado determinado que confieran alguna ventaja a su dueño sobre sus competidores". Ponce Adv. Med. v. Santiago González *et al.*, 197 DPR 891, 903-904 (2017).

En <u>Ponce Adv. Med. v. Santiago González</u> *et al.*, *supra*, tuvimos la oportunidad de delinear, por primera vez, el procedimiento adecuado para invocar y conceder el privilegio de secretos del negocio durante la etapa de descubrimiento de prueba. Así pues, expresamos que, cuando una parte propone la extensión de dicho privilegio, deberá, en primer orden, cursar a la parte que pretende la divulgación de la información una comunicación en la cual:

> (1) objete la producción de la información privilegiada tan pronto la otra parte solicite su producción; (2) indique específicamente los documentos, las comunicaciones o los objetos requeridos que designa como secreto comercial; (3) señale con particularidad los hechos precisos que dan lugar a que esa materia sea catalogada como un secreto comercial; (4) fundamente con claridad que de esa información se deriva un valor económico o una ventaja comercial demostrable, que no es conocida generalmente o verificable fácilmente por terceros, especialmente por competidores, y que ha sido objeto de medidas razonables de seguridad para mantener su confidencialidad, y por último, (5) describa la naturaleza de la evidencia no producida de forma tal que, sin ser revelada, permita a las partes y, eventualmente, al tribunal evaluar su reclamación. <u>Ponce Adv. Med. v. Santiago González</u> *et al.*, *supra*, págs. 907-908. Véase, además, la Regla 23.2 de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, R. 23.2.

De existir controversia en torno a la aplicabilidad del privilegio, luego de haberse acreditado los esfuerzos de buena fe que requiere la Regla 34.1 de las Reglas de Procedimiento Civil, *supra*, el foro primario tendrá que resolver si el promovente estableció "mediante preponderancia de la prueba, los elementos del

privilegio que invoca". [17]  McNeil Healthcare v. Mun. Las Piedras I, *supra*, pág. 408 (citando a Ponce Adv. Med. v. Santiago González *et al.*, *supra*, pág. 900). Por el contrario, si el reclamo del privilegio se hace de forma "genérica, vaga o mediante planteamientos estereotipados", se deberá declarar sin lugar la objeción y ordenar la producción de la información solicitada. Íd., pág. 901.

Así pues, una vez evaluados los planteamientos de ambas partes, el tribunal determinará si la información objeto de la controversia está protegida por el privilegio de secreto comercial.  Ponce Adv. Med. v. Santiago González *et al.*, *supra*, pág. 909.  De concluir que no se cumplen los elementos necesarios para conceder el privilegio, la información no estará protegida y deberá ordenarse su producción.  Íd., pág. 910.  En cambio, si se determina que se satisficieron los requisitos, el foro de primera instancia podrá ordenar que dicha información -total o parcialmente- sea clasificada como secretos del negocio y se deposite en un sobre sellado.  Íd., pág. 909.

**C. El contrato de seguro**

El negocio de seguros en Puerto Rico está revestido de un alto interés público.  Serrano Picón v. Multinational Life Ins., 212 DPR 981, 988-989 (2023); W.M.M., P.F.M.

---

[17]  Valga resaltar que el promovente del privilegio tiene el peso de demostrar que el mismo es aplicable, por lo que debe invocarlo de forma oportuna y específica.  Véase J.A. Cuevas Segarra, *El descubrimiento de prueba en la práctica procesal civil puertorriqueña*, Barcelona, Bosch Editor, 2023, págs. 247-248.

*et al.* v. Colegio *et al.*, 211 DPR 871, 884 (2023); San Luis Center Apts. *et al.* v. Triple-S, 208 DPR 824, 831 (2022); Consejo Titulares v. MAPFRE, 208 DPR 761, 773 (2022). Lo anterior se debe al rol que ocupa en la protección de los riesgos que amenazan la vida o el patrimonio de la ciudadanía y a su gran importancia y efecto en el desarrollo económico de la Isla. W.M.M., P.F.M. *et al.* v. Colegio *et al.*, *supra*, pág. 885; Consejo Titulares v. MAPFRE, *supra*, pág. 773.

Por consiguiente, las controversias en materia de seguro serán resueltas en virtud del Código de Seguros y su jurisprudencia interpretativa, considerando el Código Civil como fuente de derecho supletorio. Serrano Picón v. Multinational Life Ins., *supra*, pág. 989; SLG Albert-García v. Integrand Asrn., 196 DPR 382, 389 (2016). A su vez, en consideración a que nuestro Código de Seguros integra elementos de diversos sistemas de derecho, "este Tribunal ha recurrido a las normas más avanzadas del derecho civil y derecho angloamericano por su valor persuasivo".[18] Íd. Véase, además, CSMPR v. Carlo Marrero *et als.*, 182 DPR 411, 424 (2011); Casanova v. P.R.-Amer. Ins. Co., 106 DPR 689, 693 (1978).

---

[18] Es importante destacar que "nuestra normativa sobre seguros tiene afluentes de diversos sistemas de derecho". Mun. of San Juan v. Great Ame. Ins. Co., 117 DPR 632, 636 (1986)(citando a Casanova v. P.R.-Amer. Ins. Co., 106 DPR 689, 693 (1978)). Ello tiene el fin de beneficiarnos de las experiencias de otros estados y lograr que nuestra ley se adaptase a nuestras necesidades particulares. OCS v. CODEPOLA, 202 DPR 842, 854-855 (2019). En vista de este hecho, en ocasiones es conveniente ir a ellos en busca de orientación. Mun. of San Juan v. Great Ame. Ins. Co., *supra*, págs. 635-636.

El contrato de seguro se define como aquel mediante el cual "una persona se obliga a indemnizar, pagar o proveer a otra un beneficio específico o determinable cuando se produce un suceso incierto previsto en éste". Serrano Picón v. Multinational Life Ins., *supra*, pág. 989 (citando el Art. 1.020 del Código de Seguros, 26 LPRA sec. 102). Esta relación contractual entre la aseguradora y el asegurado se rige por un deber recíproco de actuar de buena fe. Consejo Titulares v. MAPFRE, *supra*, págs. 773-774. Así lo hemos reconocido al expresar que "el contrato de seguro está afecto a un pacto implícito de buena fe y el asegurador tiene la obligación de actuar con especial consideración por los intereses del asegurado".[19] Íd., pág. 774 (citando a Quiñones López v. Manzano Pozas, 141 DPR 139, 174 (1996); Morales v. Automatic Vending Service, Inc., 103 DPR 281, 288 (1975)).

No obstante, debe resaltarse "que en nuestra jurisdicción la buena fe se presume, por lo que, quien reclama la mala fe, debe[rá] probarla". Feliciano Aguayo v. MAPFRE, 207 DPR 138, 191 (2021) (citando a Citibank v. Dependable Ins. Co., Inc., 121 DPR 503, 519 (1988); Cervecería Corona v. Commonwealth Ins. Co., 115 DPR 345,

---

[19] Cabe señalar que, como regla general, la aseguradora responde hasta los límites de responsabilidad según pactado en la póliza. Consejo Titulares v. MAPFRE, 208 DPR 761, 774 (2022). No obstante, por excepción, la aseguradora podría ser responsable de pagar en exceso del límite de la cubierta cuando actúa contrario al pacto implícito de buena fe y antepone sus propios intereses a los del asegurado; es decir, cuando actúa de mala fe. Íd. Tal actuación se ha podido identificar en actos u omisiones particulares conocidos como "prácticas desleales y fraudulentas". Íd. (citando a S. Ashley, *Bad Faith Actions: Liability & Damages 2d* Sec. 2:11 (1997)).

351 (1984)). Esto responde al principio general de que el fraude -y por extensión la mala fe- no se presume en derecho. Íd. (citando a McNeil Healthcare v. Mun. Las Piedras I, *supra*, pág. 427).

**1. Las reservas de pérdidas de seguros**

El Capítulo 5 del Código de Seguros establece aquellos principios de contabilidad que las aseguradoras del país deben seguir para determinar su situación económica.[20] En virtud de dicho Capítulo, en Puerto Rico, al igual que en otros estados, se les requiere a las compañías de seguros establecer un fondo o reserva de pérdidas, conocido como Registro de Pérdidas (Reserva de Pérdida), el cual incluya un estimado de los gastos relacionados con la atención de cada reclamación reportada y no reportada. Art. 5.070 del Código de Seguros, 26 LPRA sec. 522. Específicamente, el Art. 5.070 del Código de Seguros dispone que: "[u]n asegurador deberá llevar un registro completo y detallado demostrativo de todas las pérdidas y reclamaciones de las cuales hubiere sido notificado, incluyendo, con respecto a seguros de propiedad, […] todas

---

[20] A modo aclaratorio, el Capítulo 5 del Código de Seguros fue derogado por la Ley Núm. 90-2003 con el propósito de adoptar un nuevo marco contable y armonizar sus disposiciones con los principios de contabilidad promulgados por la Asociación Nacional de Comisionados de Seguros (NAIC, por sus siglas en inglés). La Ley Núm. 90-2003 tuvo como objetivo principal actualizar las normas contables que siguen las aseguradoras en Puerto Rico al realizar sus estados financieros. Véase Exposición de Motivo de la Ley Núm. 90-2003 (2003 [Parte 1] Leyes de Puerto Rico 290). Asimismo, buscó establecer reglas uniformes que permitan a los examinadores y analistas de la Oficina del Comisionado de Seguros evaluar, de manera consistente y objetiva, la situación financiera de dichas entidades. Íd., págs. 292.

las notificaciones recibidas de la ocurrencia de cualquier eventualidad que pudiere resultar en pérdida". Íd.

En cuanto a la definición y a cómo se constituye la Reserva de Pérdida, el Lcdo. Rolando Cruz, ex Comisionado de Seguros en Puerto Rico, indica lo siguiente:

> Una vez el asegurado haya cumplido con la notificación y radicación por escrito de la prueba de pérdida[21] en torno a un accidente y el ajustador independiente[22] radicado su informe de su investigación y evalúo de la cuantificación de daños, el gerente de reclamaciones del asegurador, convencido de que la propiedad del asegurado sufriera daños (en seguro de propiedad) o que el asegurado fuera responsable de los daños o lesiones corporales a terceros (en seguro de contingencia), **establecerá una reserva tanto de pérdida como para gastos de ajuste. Esta reserva se refiere a aquella suma de dinero que el asegurador mantiene separada como un estimado para indemnizar el importe de la pérdida que éste venga obligado a honrar conforme a lo descrito en el convenio de seguro y las declaraciones en la póliza.** Las reservas de pérdidas constituyen el estimado que mejor puede reflejar lo que el asegurador eventualmente tenga que pagar por transigir la pérdida. (Énfasis y escolios suplidos). R. Cruz, *Derecho de seguros*, San Juan, Publicaciones JTS, 1999, pág. 403.

---

[21] La "prueba de pérdida" es un formulario que la aseguradora entrega al asegurado una vez recibido el "aviso de pérdida" de la reclamación para dar comienzo a la investigación. R. Cruz, *Derecho de seguros*, San Juan, Publicaciones JTS, 1999, págs. 189-190. Es importante señalar que la información contenida en la prueba de pérdida "es de carácter general toda vez que el contenido se limitará a aquella información necesariamente pertinente a la póliza objeto de la reclamación". Íd., pág. 202.

[22] "La estimación de daños y pérdidas, así como sus causas, le corresponde a un técnico especializado en la disciplina del ajuste de pérdida que el Código de Seguros denomina el ajustador". Íd., pág. 236. Por el contrario, las funciones exclusivas del "ajustador independiente", el cual rinde un informe luego de que el asegurado presenta la prueba de pérdida, son la de investigar y negociar a nombre de la aseguradora el ajuste de las reclamaciones que surjan de los contratos de seguro a los fines "de a que [la aseguradora] acepte o no la responsabilidad". Íd., págs. 236, 349.

Como podemos observar, la Reserva de Pérdida responde a una etapa inicial del proceso de la reclamación como una medida preventiva/preliminar, la cual no necesariamente refleja la realidad jurídica de la reclamación. Es decir, se trata de una estimación preliminar registrada como un pasivo contable en el estado financiero de la aseguradora, la cual representa una obligación anticipada que se pagará en el futuro como resultado de eventos pasados. Art. 5.020 del Código de Seguros, 26 LPRA sec. 517. Estas proyecciones se calculan generalmente con base en metodologías actuariales,[23] supuestos estadísticos y criterios regulatorios,[24] y su propósito principal es cumplir con requisitos de solvencia financiera y regulación contable.[25]

---

[23] La Real Academia Española define el término "actuario" como: "[una] [p]ersona versada en los cálculos matemáticos y en los conocimientos estadísticos, jurídicos y financieros concernientes a los seguros y a su régimen, que asesora a las entidades aseguradoras y sirve como perito en las operaciones de estas". *Diccionario de la lengua española*, www.dle.rae.es.

[24] Los tratadistas nos ilustran sobre los distintos métodos y elementos que pueden ser considerados al momento de calcular la reserva de pérdida. L. P. Martínez, M. S. Mayerson y D. R. Richmond, *New Appleman Insurance Law Practice Guide, Coverage Litigation*, ed. rev., New York, Matthew Bender, 2025, Vol. 2, págs. 20-51 a 20-52. Por ejemplo, en algunos casos, el monto de la reserva puede calcularse de acuerdo con la exposición de riesgos máxima a la que pueda estar expuesta la aseguradora, sin considerar los méritos de las alegaciones. Íd. Asimismo, puede considerarse en el cálculo un promedio de las pérdidas pagadas en casos anteriores. Íd. Además, la reserva de pérdida puede ser calculada a partir de datos actuariales o, en la alternativa, considerar la información particular de cada caso. Íd. A su vez, podría incluirse en el cálculo aquellos gastos de ajuste proyectados para la reclamación, entre estos, los honorarios de los abogados y el posible monto de liquidación. L. P. Martínez, M. S. Mayerson y D. R. Richmond, *New Appleman Insurance Law Practice Guide, Coverage Analysis and Prelitigation Procedure*, ed. rev., New York, Matthew Bender, 2025, Vol. 1, pág. 11-19.

[25] Aunque el Código de Seguros no especifica los elementos precisos que deben incluirse en las reservas de pérdida, ni la forma concreta a seguir, sí impone a las aseguradoras la obligación de utilizar metodologías actuariales adecuadas y que presenten, junto con su

El Código de Seguros impone a las aseguradoras el deber de mantener reservas adecuadas. Art. 5.050 (2), 26 LPRA sec. 520. Por lo que, en caso de que el Comisionado de Seguros determine que éstas son insuficientes, sin importar cómo se calculen, podrá requerir a la aseguradora que las aumente. Íd. Esta facultad procura garantizar la solvencia de la entidad y, a su vez, asegurar que los reclamantes bajo la póliza reciban el pago correspondiente a la reclamación. Exposición de Motivos de la Ley Núm. 90-2003 (2003 [Parte 1] Leyes de Puerto Rico 290-291).[26]

## 2. La reserva de pérdidas de seguros catastróficos

A raíz de ciertas catástrofes naturales ocurridas durante el 1989 y años posteriores, la Asamblea Legislativa promulgó la Ley Núm. 73-1994, según enmendada, la cual

---

informe anual, un memorando con la opinión de un actuario cualificado, conocido como la *Opinión Actuarial*. Art. 5.100 (a) del Código de Seguros, 26 LPRA sec. 523b. En este informe, el actuario deberá certificar que las reservas de las pólizas y contratos "han sido calculadas apropiadamente, se basan en suposiciones que satisfacen las disposiciones de dichos contratos, son consistentes con cantidades anteriormente informadas y cumplen con las leyes de Puerto Rico". Íd. El Comisionado de Seguros dispondrá la forma y el contenido de la Opinión Actuarial, la cual también deberá seguir las normas y guías según establecidas por la NAIC. Íd. Véase, además, Opinión Actuarial para aseguradores de propiedad y contingencia, Regla Núm. 96 del Reglamento Núm. 7993 de 17 de febrero de 2011; Carta Normativa: N-E-1-71-2006 de 25 de enero de 2006.

[26] Resulta pertinente destacar que la Exposición de Motivos de la Ley Núm. 90-2003 (2003 [Parte 1] Leyes de Puerto Rico 291), dispone lo siguiente:

> "El Comisionado de Seguros es el funcionario encargado de supervisar la condición económica de los aseguradores que hacen negocios en nuestra jurisdicción, y para esto necesita abundante información financiera, estadística y operacional sobre dichos aseguradores. **Esta supervisión debe estar diseñada para ayudar a garantizar que los tenedores de pólizas y reclamantes reciban en su día los beneficios pactados en dichas pólizas, cuando muchas veces las mismas fueron vendidas años o décadas antes de que los beneficios sean reclamados y pagados**". (Énfasis suplido).

incluyó la creación de una reserva agregada, adicional a la del Capítulo 5 del Código de Seguros, específica y restringida para enfrentar eventos catastróficos. Art. 25.010 del Código de Seguros, 26 LPRA sec. 2501.

En términos generales, el Capítulo 25 del Código de Seguros requiere que las aseguradoras que ofrecen seguros catastróficos establezcan una reserva especial, conocida como Reserva de Pérdidas de Seguros Catastróficos (Reserva Catastrófica), para el pago de las pérdidas ocurridas como consecuencia de ciertos eventos a los que podría estar expuesto Puerto Rico.[27] Íd. Esta reserva tiene como objetivo que los aseguradores del país cuenten con la capacidad financiera necesaria para ofrecer protección adecuada a aquellos asegurados expuestos a los riesgos asociados con eventos catastróficos, según reconocidos en la ley, tales como huracanes, terremotos, tormentas, entre otros.[28] Íd. Al mismo tiempo, el establecimiento de la Reserva Catastrófica procura que las aseguradoras reduzcan su dependencia respecto a los reaseguradores extranjeros y puedan ofrecer seguros catastróficos a tarifas razonables. Íd.

---

[27] El término "seguros catastróficos" incluye: "[…] seguro de todas clases de bienes raíces o bienes muebles e interés sobre los mismos, contra pérdidas o daños por causa de terremoto, tormenta, ciclón, huracán, incendio u otras catástrofes, y contra pérdidas como consecuencia de tales pérdidas o daño". Art. 25.020 (5) del Código de Seguros, 26 LPRA sec. 2502.

[28] Íd.

En cuanto a cómo se computa tal reserva, el Código de Seguros dispone que, [29] anualmente, se aplicará al total de las primas suscritas en seguros de propiedad catastróficos un porciento que el Comisionado de Seguros, de tiempo en tiempo, determinará mediante reglamentación expresa.[30] Art. 25.030 (2) del Código de Seguros, 26 LPRA sec. 2503. Una vez calculadas, tales aportaciones deberán depositarse en un fideicomiso que el asegurador creará única y exclusivamente con el propósito de regir el manejo de los fondos que respalda la Reserva Catastrófica. Art. 25.040 del Código de Seguros, 26 LPRA sec. 2504.

Es importante señalar que la aseguradora podrá hacer cargos contra la Reserva Catastrófica y retirar activos del fideicomiso únicamente en las circunstancias descritas en el Art. 25.060 del Código de Seguros, 26 LPRA sec. 2506. Por ejemplo, la aseguradora podrá retirar fondos del

---

[29] La forma de presentar y contabilizar la Reserva de Pérdidas de Seguros Catastróficos (Reserva Catastrófica) se hará según lo establecido en la Operación de la reserva de pérdidas de seguros catastróficos, Regla 72 del Reglamento Núm. 7810 de 13 de enero de 2012, según enmendada, y aquellas disposiciones contenidas en la Carta Normativa N-E-2-68-95 de 10 de marzo de 1995, según enmendada mediante la Carta Circular E-06-1611-2001 de 14 de septiembre de 2001. En resumen, la Carta Normativa Núm. N-E-2-68-95 de 10 de marzo de 1995, notificó a los aseguradores locales el tratamiento contable y presentación en el informe anual de la Reserva Catastrófica, el cual dispone que se efectuará en el periodo contable en que ocurran las pérdidas catastróficas. Por su parte, dicha Carta Normativa fue enmendada a través de la Carta Circular Núm. E-06-1611-2001 de 14 de septiembre de 2001, con el fin de atemperarla a la Codificación de los Principios de Contabilidad Estatutaria, promulgados por la NAIC.

[30] Cabe señalar que el Código de Seguros establece que violar las disposiciones del Capítulo 25 del Código de Seguros, además de una multa administrativa ascendente a la reserva no establecida o la cantidad de dinero no depositada en el fideicomiso, podrá conllevar la revocación del certificado de autoridad para operar el negocio de seguros de Puerto Rico. Art. 25.090 del Código de Seguros, 26 LPRA sec. 2509.

fideicomiso para el pago de pérdidas catastróficas y gastos de ajustes, siempre que las pérdidas excedan del cinco por ciento (5%) de la prima neta directa suscrita. Art. 25.060 (1) del Código de Seguros, 26 LPRA sec. 2506.

Como podemos ver, aun cuando los Capítulos 5 y 25 del Código de Seguros, respectivamente, utilizan el término "reserva de pérdida" en sus disposiciones, ambas reservas no cumplen el mismo propósito y función regulatoria. **Por su parte, la Reserva de Pérdida del Capítulo 5 es una reserva técnica contable que se establece como parte del cálculo de solvencia requerido en los estados financieros de las aseguradoras que operan en Puerto Rico, de modo que puedan cubrir pérdidas comunes notificadas o esperadas. Por otro lado, la Reserva Catastrófica, según establecida por el Capítulo 25, es un fondo acumulativo a largo plazo en un fideicomiso que sólo puede utilizarse en las circunstancias extraordinarias dispuestas en la ley.**

Acorde con lo mencionado, el requisito de Reserva de Pérdida del Capítulo 5 del Código de Seguros refleja el deseo de la Asamblea Legislativa de que existan recursos disponibles para cubrir la futura responsabilidad del asegurador y que los asegurados reciban en su día los beneficios según fueron pactados en la póliza suscrita, independientemente de la ocurrencia o no de eventos catastróficos. **Por lo que, de acuerdo con los hechos en el presente caso, no cabe duda de que el Consejo de Titulares solicitó el descubrimiento de la Reserva de**

**Pérdida contable, según regulada por el Capítulo 5 del Código de Seguros, la cual fue creada internamente por la aseguradora luego de evaluar y atender la reclamación particular del asegurado, respecto a los daños sufridos en su propiedad tras el paso de los huracanes Irma y María.[31] Por consiguiente, el Capítulo 5 del Código de Seguros es la disposición legal aplicable para resolver las controversias ante nuestra consideración.**

Cabe señalar que, a pesar de su importancia, el Código de Seguros no expresa categóricamente si la Reserva de Pérdida contable constituye información confidencial o si está excluida automáticamente del descubrimiento de prueba en un litigio civil por estar protegida bajo algún privilegio. Por tanto, su divulgación deberá evaluarse caso a caso, según los preceptos legales previamente discutidos.

Evaluado el texto y alcance del Capítulo 5 del Código de Seguros, procederemos a examinar el desarrollo normativo de las reservas de pérdidas en otros estados.

3. **El tratamiento de las reservas de pérdida en Estados Unidos**

Las determinaciones de los tribunales estatales están divididas en cuanto al descubrimiento de la información

---

[31] Al igual que la Reserva Catastrófica, el Registro de Pérdidas del Capítulo 5 (Reserva de Pérdida) aplica a seguros de propiedad que cubren riesgos catastróficos. No obstante, la función principal de la Reserva de Pérdida es estimar y mantener reservas adecuadas de las reclamaciones notificadas o esperadas para que las aseguradoras puedan cumplir con sus obligaciones contractuales. Esta clase de reserva no sustituye la función preventiva/preliminar de la Reserva Catastrófica, la cual requiere que se acumule anualmente cierta cantidad de dinero por adelantado y que, a su vez, se cree un fondo especial para eventos catastróficos cuya magnitud pudiera superar el cinco por ciento (5%) de la prima neta directa suscrita.

contenida en la Reserva de Pérdida de reclamaciones.**32**
Empero, al considerar la procedencia del descubrimiento de
las reservas, la esfera estatal ha evaluado la solicitud a
la luz de las Reglas de Procedimiento Civil del foro
aplicable, las cuales, en términos generales, exigen que
la prueba solicitada sea pertinente y no privilegiada. Así
pues, al examinar ese asunto, además de considerar el
método utilizado por la aseguradora para establecer las
reservas de pérdidas, los tribunales estatales toman en
consideración la naturaleza del caso y el propósito por el
cual se solicita dicha información. State ex rel. Erie
Ins. Property & Cas. Co. v. Mazzone, 625 S.E.2d 355,
359-360 (W.Va. 2005). Es decir, al sopesar su relevancia,**33**
y, por tanto, su posible descubrimiento, la jurisdicción
estatal reconoce que los tribunales **deberán considerar las
circunstancias particulares que se presenten en cada caso.**
Íd. **34**

---

**32** Véase Miller v. Kenny, 325 P.3d 278, 298 (Wash. Ct. App. 2014)
("As a general policy, it is preferable that loss reserves not be
admitted into evidence, because when an insurer sets loss reserves it
should be solely concerned with the purpose of ensuring the company's
financial stability and should not be tempted to 'manipulate its
reserves' to be consistent with the insurer's settlement position").

**33** Además de examinar la relevancia, algunas jurisdicciones han
evaluado si la información sobre las reservas de pérdidas constituye
información confidencial protegida por algún privilegio.
Particularmente, algunos tribunales estatales han excluido del
descubrimiento de prueba dicha información tras resolver que aplica
algún privilegio, entre estos, la doctrina del producto del trabajo
(*work product*). Véase Union Carbide Corp. v. Travelers Indem. Co.,
61 F.R.D. 411, 413 (WD Pa. 1973) (En este caso, por ejemplo, la Corte
de Distrito de Pensilvania denegó la presentación de información
relacionada a las reservas de pérdida por ser irrelevante y, a su vez,
ordenó al tribunal inferior a examinar la aplicabilidad del privilegio
del producto del trabajo).

**34** Véanse, además, Signature Dev. Cos., Inc. v. Royal Ins. Co. of
America, 230 F.3d 1215, 1224 (10th Cir. 2000) (La Corte de Apelaciones
del Décimo Circuito confirmó al tribunal de distrito en cuanto a que

Si bien algunos tribunales han permitido el descubrimiento de las reservas de pérdida en algunas circunstancias -particularmente en demandas de primera parte[35] donde el asegurado alega y fundamenta que la aseguradora incumplió su deber de buena fe por no transigir dentro de los términos de la póliza de seguro-,[36]

---

el asegurado no logró demostrar que la aseguradora incumplió con su deber de indemnizar y que la información de la reserva no demostraba la presunta mala fe, ya que ésta no constituía una admisión de responsabilidad. Particularmente se determinó sobre la reserva de pérdida lo siguiente: "Royal's reserve calculation is merely an amount it set aside to cover potential future liabilities"); e Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co., 117 F.R.D. 283, 288 (D.D.C.1986) (Tras evaluar el expediente, se denegó el descubrimiento de las reservas por entender que no eran relevantes. En particular, la Corte del Distrito de Columbia resolvió que las reservas eran "information of very tenuous relevance, if any relevance at all" debido a que "a reserve essentially reflects an assessment of the value of a claim taking into consideration the likelihood of an adverse judgment and that such estimates of potential liability do not normally entail an evaluation of coverage based upon a thorough factual and legal consideration when routinely made as a claim analysis.")

[35] Aunque el término en ocasiones se utiliza de distintas maneras, en materia de seguros, "primera parte" se refiere a litigios instados directamente por el asegurador con arreglo a los términos de su póliza, generalmente por reclamaciones de incumplimiento de contrato y mala fe. Martínez, Mayerson y Richmond, *op. cit.*, Vol. 2, pág. 19-60. En Puerto Rico, a esta persona se le denomina el "reclamante primario" o el "asegurado reclamante". Cruz, *op. cit.*, págs. 191-192.

[36] Por ejemplo, en Lipton v. Superior Ct., 48 Cal.App.4th 1599 (1996), se instó una demanda de primera parte contra la aseguradora por su presunta negligencia y mala fe al no transigir dentro de los límites de la póliza en una demanda de terceros contra el asegurado. Entre otras cosas, el demandante alegó que la aseguradora no manejó razonablemente la oportunidad de transigir y, por tanto, solicitó los documentos relacionados con la reserva de pérdida. Así pues, el Tribunal de Apelaciones de California autorizó el descubrimiento de la reserva tras concluir que estas eran relevantes al elemento de mala fe **en el contexto en el cual la aseguradora asumía el control de la defensa y proceso de transacción de la demanda contra el asegurado**. Por lo que, resolvió que el demandante logró fundamentar que dicha información podía probar: (1) el estado mental de la aseguradora respecto al manejo de la reclamación; (2) el conocimiento de la aseguradora de que aplicaban múltiples límites de póliza a la reclamación subyacente, y (3) la indiferencia de la aseguradora hacia el consejo de su propio abogado con respecto a la posible responsabilidad extracontractual del asegurado. Íd., pág. 1608 esc. 8. Ahora bien, es importante señalar que el Tribunal de Apelaciones de California resolvió que dicha información podría estar protegida por el privilegio del producto del trabajo, dependiendo de las circunstancias específicas de su creación. Íd., pág. 1620. Asimismo, reconoció en su razonamiento que las reservas de pérdidas **no podían equipararse a una admisión de responsabilidad o valoración de la reclamación**. Íd., pág. 1613 ("a reserve cannot accurately or fairly

**el consenso mayoritario en la doctrina y la jurisprudencia es que dichas reservas no constituyen admisiones y, por tanto, no son descubribles.**[37] De manera consistente se ha sostenido que las reservas de pérdidas **no son admisiones** de responsabilidad, cobertura o mala fe, sino que, por el contrario, representan **estimaciones contables internas** que reflejan, de forma preliminar, la posible exposición económica de la aseguradora ante una reclamación. [38]

---

be equated with an admission of liability or the value of any particular claim.")

[37] Véase D. R. Richmond, *Recurring Discovery Issue in Insurance*, *Bad Litigation*, 52:3 Tort Trial & Insurance Practice Law Journal 750, pág. 768 (2017).

[38] Véanse <u>Ro v. Everest Indemnity Insurance Company</u>, No. C16-0664RSL, Slip op. at 2 (W.D.Wash. Jan. 25, 2017) ("The establishment of a reserve amount is required by Washington law and is not, therefore, an admission of coverage or liability under the policy"); <u>First Horizon National Corporation v. Houston Casualty Company</u>, No. 2:15-cv-2235-SHL-dkv, Slip op. at 1 (W.D.Tenn. Oct. 5, 2016) ("The reserves set up by the Defendants are a business judgment and do not reflect a legal determination of the validity of the Plaintiffs' claim against them"); <u>Cummins v. Ace Am. Ins. Co.</u>, No. 1:09-cv-00738-JMS-DML, Slip op. at 1 (S.D. Ind. Jan. 14, 2011) ("The court agrees with the Insurers that the connection between the requested loss reserve information and the issues in this case is too attenuated to require the Insurers to search for and produce every document that relates to the setting (or not setting) of loss reserves for Cummins's [c]laim. Because of the business risk and regulatory compliance considerations involved in the setting of loss reserves, loss reserves information are not synonymous with, and may not be particularly probative of, an Insurer's opinion on the true value of a particular claim or on coverage"); <u>Sunahara v. State Farm Mut. Auto. Ins. Co.</u>, 280 P.3d 649, 656 (Colo., 2012) (En este caso, la Corte Suprema de Colorado coincidió con otros tribunales en cuanto a que no procedía el descubrimiento de las reservas. En lo pertinente, concluyó lo siguiente: "we held that neither are reasonably calculated to lead to admissible evidence—and thus are not generally subject to discovery—because: (1) they do not accurately reflect the insurer's valuation of a particular claim; (2) they are not admissions of liability; and (3) insurance companies prepare them simply to satisfy statutory obligations and to establish bargaining tactics. Thus, as the court of appeals held in this case, reserves and settlement authority figures "are irrelevant to a jury's determination of liability and damages and are not reasonably calculated to lead to the discovery of admissible evidence"); <u>State ex rel. Erie Ins. Property & Cas. Co. v. Mazzone</u>, 625 S.E.2d 355, 359 (W.Va. 2005) ("setting of reserves is merely a preliminary estimate of potential liability that does not take into account all the factual and legal components that make up a particular case"); y <u>Rhone-Poulenc Rorer, Inc. v. Home Indemnity Co.</u>, 139 F.R.D. 609, 613 (E.D. Pa. 1991) ("seeking [reserves] information is of very tenuous relevance, if any relevance at all […].")

Aunque su alcance puede variar según la jurisdicción, en términos generales, las reservas de pérdidas son fondos que las aseguradoras mantienen para cubrir reclamaciones por pérdidas ocurridas, pero aún no resueltas.[39] Al igual que en nuestra jurisdicción, éstas se calculan principalmente para cumplir con requisitos regulatorios y no como parte del análisis sustantivo del reclamo.[40] Por ello, en consideración a su naturaleza, diversos tribunales han determinado que, a los efectos del descubrimiento de prueba, este tipo de información resulta impertinente, ya que su preparación responde únicamente a exigencias legales.[41]

---

[39] Particularmente, las reservas de pérdida se definen de la siguiente manera:

> "Reserves, which are sometimes described as loss reserves, are funds held by an insurer to pay claims for losses that have occurred but have not been resolved. Reserves assigned to individual claims may be described as case reserves. Reserves 'are liabilities in the accounting sense because they are shown on an insurer's financial statements as sums that the insurer owes to others. They represent an estimate of the amount of claim payments the insurer will make in the future'." Richmond, *supra*, pág. 766 (citando a CAL. INS. CODE sec. 923.5 (2015); N.Y. INS. L. sec. 1303 (2015)).

[40] Es importante señalar que algunos tribunales estatales han resuelto que la información contenida en las reservas se basa en estimaciones internas del asegurador, frecuentemente hipotéticas, las cuales no necesariamente están fundamentadas en un análisis fáctico o legal de la reclamación. Liberty Mutual Fire Insurance Company v. APAC-Southeast, Inc., No. 1:07-CV-1516-JEC, Slip op. at 1 (N.D.Ga. May. 16, 2008) (citando a Union Carbide Corp. v. Travelers Indem. Co., 61 F.R.D. 411, 413 (W.D. Pa. 1973)).

[41] En el caso de California, por ejemplo, el Código de Seguros requiere a las aseguradoras que operen en dicho estado que establezcan y mantengan reservas de pérdidas para cubrir el pago de todas las pérdidas y las reclamaciones por las que la aseguradora pueda ser responsable y para, a su vez, cubrir los gastos de ajuste o liquidación. Véase In re Couch, 80 B.R. 512, 516-517 (S.D.Cal.,1987) ("The legislature and Insurance Commissioner establish reserve policy. For this reason alone, a reserve cannot accurately or fairly be equated with an admission of liability or the value of any particular claim.") Véase, además, Sunahara v. State Farm Mut. Auto. Ins. Co., *supra*, pág. 656.

En esa misma línea, se ha resuelto que las reservas de pérdidas tampoco son pertinentes para evaluar alegaciones de mala fe en una reclamación de primera parte. Imperial Textiles Supplies Inc. v. Hartford Fire Insurance Company, No. 6:09-cv-03103, Slip op. at 6 (D.S.C. May. 5, 2011).[42] Esto se debe a que la mala fe **no** se determina a partir de estimaciones contables, sino a base de dos (2) elementos esenciales: (1) la razonabilidad y diligencia con la que la aseguradora investigó la reclamación, y (2) el análisis sobre si los daños reclamados estaban cubiertos bajo la póliza. Íd. (citando a Spearman Indus., Inc. v. St. Paul Fire and Marine Ins. Co., 128 F.Supp.2d 1148, 1154 (N.D.Ill.2001)).[43]

**4. El informe sobre ORSA y la Ley Núm. 42-2020**

El impacto de los huracanes Irma y María en Puerto Rico en el mes de septiembre de 2017 generó pérdidas

---

[42] En Imperial Textiles Supplies Inc. v. Hartford Fire Insurance Company, No. 6:09-cv-03103, Slip op. at 6 (D.S.C. May. 5, 2011), un caso sobre incumplimiento de contrato y mala fe, la Corte de Distrito de Carolina del Sur denegó una moción presentada por el asegurado para solicitar el descubrimiento de la información de la reserva de pérdida tras concluir que no era pertinente al litigio sobre cobertura. El tribunal analizó la jurisprudencia y determinó que la reserva de pérdida era irrelevante para probar una reclamación de mala fe de primera parte ya que no tenía conexión con la causa de acción principal y, por tanto, su producción era improcedente.

[43] En dicha ocasión, la Corte de Distrito de Carolina del Sur determinó lo siguiente:

"On the other hand, in first-party insurance, the policy either provides coverage or does not. Thus, the potential for liability-and therefore reserve information—is irrelevant to a bad faith claim. Rather, in first-party insurance, the insurer's good faith is determined (1) by the manner and depth of its investigation, and (2) the determination of whether there was a good faith factual or legal question as to whether the loss was covered". Íd. (citando a Spearman Indus., Inc. v. St. Paul Fire and Marine Ins. Co., 128 F.Supp.2d 1148, 1154 (N.D.Ill.2001)).

catastróficas multimillonarias que afectaron tanto a los ciudadanos, como a la industria de seguros. Con. Tit. 76 Kings Court v. MAPFRE, 208 DPR 1018, 1029-1030 (2022). Estos eventos atmosféricos provocaron una crisis socioeconómica que no se había experimentado en décadas. Íd. En consideración a esto, la Asamblea Legislativa aprobó la Ley Núm. 42-2020 como una herramienta para fortalecer la supervisión financiera y garantizar la estabilidad del mercado de seguros. Art. 53.010 del Código de Seguros, 26 LPRA sec. 4531. En términos generales, la Ley Núm. 42-2020 enmendó el Capítulo 53 del Código de Seguros e incorporó los principios de la ley "Risk Management and Own Risk Solvency Assessment Model Act" (ORSA, por sus siglas en inglés) de la Asociación Nacional de Comisionados de Seguros (NAIC, por sus siglas en inglés), para establecer un marco regulatorio uniforme de administración, evaluación de riesgos propios y solvencia financiera.[44] Íd.

El propósito de la mencionada legislación es que los aseguradores, organizaciones de servicios de salud y otros grupos no exentos, realicen periódicamente una evaluación interna sobre riesgos propios y solvencia y elaboren un informe anual, conocido como el Informe sobre ORSA

---

[44] El objetivo de los requerimientos de la regulación de ORSA es anticipar y prever aquellas actividades de negocio de alto riesgo para evitar que ocurran futuros problemas de insuficiencia de capital o solvencia. Véase Exposición de Motivos de la Ley Núm. 42-2020 (2020 [Parte 1] Leyes de Puerto Rico 436). A su vez, promueve que la industria de seguros en Puerto Rico esté fortalecida ante futuros eventos catastróficos. Íd.

(Informe), conforme lo establece el Manual de Guía sobre ORSA adoptado por la NAIC.[45]  Art. 53.040 del Código de Seguros, 26 LPRA sec. 4534.  Este Informe deberá incluir aquellos riesgos empresariales que podrían conllevar un impacto adverso en la solvencia financiera de la entidad e impedir el cumplimiento de las obligaciones contractuales hacia los asegurados. Art. 53.070 del Código de Seguros, 26 LPRA sec. 4537.  Véase, además, Exposición de Motivos de la Ley Núm. 42-2020 (2020 [Parte 1] 436-437). **Este requisito regulatorio contendrá evaluaciones internas confidenciales sobre el perfil de riesgo de la aseguradora, su estrategia empresarial y la suficiencia de capital.** Art. 53.070 del Código de Seguros, *supra*.

A fin de promover una política pública clara de protección al análisis estratégico de gestión de riesgos de las aseguradoras, el Art. 53.080 del Código de Seguros, *supra*, reconoce de forma clara y expresa que el Informe, así como sus documentos y materiales de apoyo para complementar su comprensión, son confidenciales y de

---

[45]  El Manual de Guía sobre ORSA (Manual), al cual el Código de Seguros hace referencia, dispone unas reglas guías para la implementación de la ley ORSA.  Dicho Manual establece que el Informe sobre ORSA (Informe) constará de tres (3) secciones, a saber:  la descripción del marco de gestión de riesgos del asegurador; la evaluación de exposiciones a riesgo del asegurador y una evaluación grupal del capital de riesgo y evaluación prospectiva de solvencia. ("Section 1 – Description of the Insurer's Risk Management Framework[,] Section 2 – Insurer's Assessment of Risk Exposures [and] Section 3 – Group Assessment of Risk Capital and Prospective Solvency Assessment.") *NAIC Own risk and solvency assessments (ORSA) Guidance Manual*, pág. 3, https://content.naic.org.

naturaleza privilegiada, no sujeto a inspección pública.**46**

En lo pertinente, el citado artículo establece que:

> Todo documento, material u otra información, incluyendo el Informe sobre ORSA que haya sido obtenido por la Oficina del Comisionado de Seguros, o esté bajo el control de dicha oficina, conforme a este Capítulo, se considerarán como derecho propietario que contiene secretos de negocios. Todos estos documentos, materiales e información serán confidenciales y de naturaleza privilegiada y no estarán sujetos a inspección pública. El Comisionado no divulgará los documentos, materiales u otra información, sin el consentimiento previo por escrito del asegurador, grupo de aseguradores u organización de servicios de salud correspondiente. […]. Art. 53.080 (a) del Código de Seguros, 26 LPRA sec. 4538.

Como vemos, el carácter confidencial y privilegiado del Informe y sus anejos surge de una disposición legal expresa que busca salvaguardar el análisis financiero estratégico de gestión de riesgos de las aseguradoras. Por tanto, aunque comparten un propósito general relacionado con la solvencia, no se extiende automáticamente a otros elementos como la Reserva de Pérdida regular creada como parte del curso ordinario de los negocios.

### III

Triple-S sostiene que el Tribunal de Apelaciones erró al intervenir con la determinación del foro primario. Alega esto pues el Consejo de Titulares no logró demostrar que el Tribunal de Primera Instancia incurrió en pasión, prejuicio, error manifiesto o parcialidad. A esos efectos,

---

**46** Estos materiales de apoyo para complementar el Informe pueden incluir políticas o programas de gestión de riesgos, como, por ejemplo, políticas de suscripción, inversión, reclamaciones, gestión de activos y pasivos, reaseguro y políticas de riesgo operativo. Íd., pág. 4.

la peticionaria argumenta que la información sobre la Reserva de Pérdida no es pertinente al presente litigio ya que dicha información no constituye prueba sobre cobertura o responsabilidad. Del mismo modo, Triple-S expone que la reserva asignada a la reclamación de los recurridos no conduce a prueba admisible que refleje la presunta mala fe de la peticionaria durante la investigación y ajuste de la reclamación. Asimismo, argumenta que se trata de información privilegiada protegida por el privilegio de secretos del negocio conforme con el Código de Seguros y la Regla 513 de las Reglas de Evidencia, *supra*, y, además, constituye información confidencial bajo la doctrina del producto del trabajo (*work product*).

De otra parte, la justificación principal del Consejo de Titulares para solicitar la información sobre las reservas es su presunta relevancia para probar las alegaciones de mala fe de Triple-S en la tramitación de la reclamación. Para los recurridos, dicha información "puede potencialmente proporcionar una idea de la opinión de la aseguradora sobre el valor de la reclamación del asegurado […] y, en consecuencia, probar su responsabilidad".[47] El Consejo de Titulares arguye, además, que la peticionaria no invocó de forma expresa, oportuna y fundamentada los privilegios que alega impiden el descubrimiento de la información solicitada. En consecuencia, plantea que no

---

[47] *Alegato en oposición* presentado por el Consejo de Titulares el 6 de septiembre de 2024, págs. 13 y 17.

existe abuso de discreción, prejuicio o parcialidad en la decisión del foro apelativo intermedio, por lo que el aludido tribunal actuó de manera correcta al revocar de forma parcial la *Orden* del Tribunal de Primera Instancia.

Según adelantamos, la controversia central que nos ocupa se ciñe a determinar si el Tribunal de Apelaciones erró al revocar la determinación del foro primario para autorizar el descubrimiento de prueba sobre la Reserva de Pérdida y el expediente de suscripción de la póliza.

Por estar relacionados entre sí, atenderemos en conjunto los señalamientos de error planteados por Triple-S.   Adelantamos que, luego de examinar los planteamientos de las partes y el expediente ante nuestra consideración, resolvemos a favor de la peticionaria.

En lo que respecta a la Reserva de Pérdida de la reclamación, aun cuando nuestro ordenamiento jurídico reconoce un descubrimiento de prueba amplio y liberal, no albergamos duda de que, bajo las circunstancias particulares de este caso,[48] no procede el descubrimiento de prueba de dicha información.   Aunque en el contexto del descubrimiento de prueba hemos expresado que la pertinencia debe evaluarse en términos amplios, ello no implica que el proceso carezca de límites.   Corresponde al tribunal ejercer su discreción de forma equilibrada e interpretar

---

[48] Entiéndase, que se presentó una causa de acción sobre incumplimiento de contrato de seguro de propiedad y el reclamo se circunscribe a la obligación contractual de investigación y ajuste razonable por parte de la aseguradora y la cuestión fáctica sobre la cobertura de los daños reclamados, según los términos de la póliza.

el concepto de pertinencia cónsono con el principio rector de las reglas procesales, el cual requiere excluir cualquier solicitud que no guarde una conexión razonable con los asuntos en controversia.

Al aplicar el marco jurídico antes expuesto, estamos convencidos de que la solicitud de documentos relacionada con la Reserva de Pérdida correspondiente a la reclamación del Consejo de Titulares resulta impertinente al litigio. Ello se debe a que dicha información **no** guarda relación posible con el ajuste real de la reclamación ni constituye, en modo alguno, una admisión de responsabilidad por parte de la aseguradora. En términos generales, bajo el esquema reconocido en distintas jurisdicciones de Estados Unidos, al sopesar la relevancia de las reservas de pérdida en el proceso de descubrimiento de prueba, los tribunales deben examinar tres (3) elementos fundamentales: (1) los métodos o prácticas mediante los cuales las aseguradoras establecen las reservas de pérdidas; (2) la naturaleza del caso, y (3) el propósito por el cual se solicita la información. En esa misma línea, la determinación sobre su pertinencia va a requerir un análisis basado en las circunstancias particulares de cada caso.

En primer término, la Reserva de Pérdida relacionada con la reclamación de los recurridos fue establecida conforme a lo dispuesto en el Art. 5.070 el Código de Seguros, *supra*. Es decir, fue establecida como parte de las funciones, obligaciones y responsabilidades ordinarias

de la aseguradora. Según adelantamos, una vez el asegurado completa el formulario de prueba de pérdida y un ajustador independiente entrega su informe sobre la potencial responsabilidad, personal interno de la aseguradora procede a crear una reserva tanto de pérdida como para los gastos de ajuste.[49] Estas reservas constituyen estimaciones contables internas que reflejan una evaluación provisional sobre su posible exposición económica ante la reclamación.

Ahora bien, en nuestra jurisdicción, el Código de Seguros impone a las aseguradoras la obligación de mantener dichas reservas de pérdidas con el propósito de garantizar su capacidad económica para responder ante obligaciones futuras bajo los términos de sus pólizas. Su finalidad principal es cumplir con requisitos de solvencia financiera y con las normas contables exigidas por la ley. Dicho de otro modo, la creación de las reservas de pérdidas responde a un mandato legal de naturaleza regulatoria y, por consiguiente, **no constituye una aceptación de cobertura ni una admisión de responsabilidad.**

En segundo término, las reservas de pérdidas, incluso cuando son específicas de una reclamación, son estimaciones meramente preventivas/preliminares que, en términos generales, no implican una evaluación exhaustiva de los

---

[49] Nótese que quien establece la reserva es usualmente un funcionario del departamento de reclamaciones de la aseguradora, posterior a una notificación preliminar sobre la posible existencia de responsabilidad, la cual no constituye un ajuste final de la reclamación. Cruz, *op. cit.*, pág. 403.

méritos fácticos y jurídicos de una reclamación. Entiéndase, se trata de una estimación contable cautelar construida sobre datos incompletos orientada a cumplir con requisitos regulatorios. Por ello, permitir su descubrimiento en el contexto del presente litigio de alegado incumplimiento de contrato por cobertura **–particularmente cuando las alegaciones de mala fe y conducta dolosa no han sido debidamente fundamentadas en hechos concretos–**, contraviene el principio de pertinencia y no se justifica el acceso a dicha información. Resolver lo contrario implicaría abrir la puerta a la divulgación de estimaciones internas, especulativas y, en algunos casos, protegidas. Estas no guardan relación posible con el asunto en controversia por haberse creado en cumplimiento de requisitos regulatorios.

De igual manera, resulta aplicable en este caso el mismo razonamiento de este Tribunal respecto a la impertinencia de la información contenida en el expediente de suscripción de la póliza. Aun cuando en su *Petición de certiorari* ante nos Triple-S no incluyó como un señalamiento de error el asunto sobre el proceso de suscripción de la póliza (*underwriting*), **la peticionaria lo discutió de forma incidental y como un elemento patente de la pertinencia y la presunta confidencialidad de la información solicitada en su segundo y tercer señalamientos de error.** *Petición de certiorari* presentada por Triple-S el 7 de agosto de 2025, págs. 9, 13. De igual forma, dicha

controversia fue resuelta por el Tribunal de Primera Instancia en la *Orden* emitida el 2 de septiembre de 2023. **En específico, el foro primario dispuso que el proceso de suscripción de la póliza era materia impertinente.** *Orden* del Tribunal de Primera Instancia emitida el 2 de septiembre de 2023, pág. 388. Por otro lado, a nivel del Tribunal de Apelaciones, los planteamientos del Consejo de Titulares sobre este particular fueron refutados por la peticionaria en su escrito de *Oposición a petición de certiorari* y atendidos por el foro apelativo intermedio en su *Sentencia* emitida el 19 de diciembre de 2023. *Oposición a petición de certiorari* presentada por Triple-S ante el Tribunal de Apelaciones, págs. 8-15; *Sentencia* del Tribunal de Apelaciones emitida el 19 de diciembre de 2023, págs. 13-14. **Sobre este extremo, el Tribunal de Apelaciones resolvió que, contrario a la determinación del Tribunal de Primera Instancia, dicha información era pertinente.** Íd. Por tanto, en aras de dispersar cualquier duda sobre esta disputa, atenderemos este asunto por considerarlo medular a la controversia.

En el caso ante nuestra consideración, los recurridos no establecieron de qué forma los documentos o procesos relacionados con la suscripción resultan esenciales para la resolución del presente litigio.[50] Es decir, el Consejo

---

[50] Con relación a la materia de seguros, el término suscripción (*underwriting*), se refiere al procedimiento mediante el cual una aseguradora evalúa un potencial asegurado y determina los términos y

de Titulares no fundamentó cómo la información solicitada

guarda una relación sustancial con la finalidad del proceso

sobre cubierta según los términos de la póliza y la

insatisfacción del asegurado con el ajuste y pago efectuado

por Triple-S.[51]

En tercer término, los interrogatorios y requerimientos

de información cursados por los recurridos resultan

excesivos y onerosos dentro de un proceso de incumplimiento

de contrato de seguro de propiedad por cobertura como el

---

condiciones bajo los cuales se dispone a asegurar algún riesgo en
particular.

[51] Resulta necesario destacar que, en algunas jurisdicciones en
Estados Unidos, en disputas relacionadas al descubrimiento de prueba
en materia de seguros, los tribunales han considerado que los
expedientes de suscripción, los manuales de suscripción y otros
documentos similares son irrelevantes, particularmente cuando el
asegurado no alega que el lenguaje de la póliza de seguro es ambiguo
o no se identifica alguna controversia que implique prácticas de
suscripción. Farm Bureau Life Ins. Co. v. Holmes Murphy & Associates,
Inc., 831 N.W.2d 129, 137 (Iowa, 2013); Mach. Movers, Riggers & Mach.
Erectors, Loc. 136 Defined Contribution Pension Plan v. Fid. & Deposit
Co. of Mary, No. 06 C 2539, Slip op. at 3 (N.D. Ill. Oct. 19, 2007)
(Tras alegarse que ciertas cláusulas de la póliza de seguro eran
ambiguas, la Corte de Distrito de Illinois autorizó el descubrimiento
del expediente de suscripción luego de resolver que podría ser
evidencia relevante para comprender el significado de los términos de
la póliza en controversia). Particularmente, se ha resuelto que el
expediente de suscripción **no está relacionado con la decisión de una
aseguradora sobre cubrir una determinada pérdida reclamada por un
asegurado.** En Allstate Insurance Company v. Breeden, No. 01-1686-JE,
Slip op. 1 (D.Or. Mar. 1, 2002), la Corte de Distrito de Oregon dispuso
lo siguiente: "[a]n insurer has an obligation to its insureds to do
its underwriting at the time a policy application is made, not after
a claim is filed." Por lo que, para propósitos de un litigio de
cobertura, se considera impertinente el expediente de suscripción. Íd.

Ahora bien, en cuanto a los escenarios en los que sí se ha
autorizado su descubrimiento, los tratadistas nos señalan los
siguientes: (a) cuando un asegurado alega que la aseguradora cometió
fraude al proveer una cobertura engañosa e ilusoria desde el principio,
(b) cuando el asegurado alega que la aseguradora intentó rescindir
la póliza de mala fe porque las pérdidas fueron mayores de lo
anticipado durante el proceso de suscripción, (c) cuando un asegurado
alega que la aseguradora describió erróneamente los términos o el
alcance de la cobertura de la póliza cuando la otorgó y, (d) cuando
está en controversia si el asegurado proporcionó información falsa o
incompleta en su solicitud y se necesita evaluar si dicha información
era material para el proceso de suscripción. J. E. Thomas, L. A.
Foggan y L. S. Masters, *New Appleman on Insurance Law Library Edition,
Litigation, Arbitration and Settlement*, 39th ed. rev., New York,
Matthew Bender, 2024, Vol. 12, pág. 152-53.

que nos ocupa. De hecho, tales solicitudes son incompatibles con la finalidad del procedimiento mismo del descubrimiento de prueba e inciden con la política de nuestro ordenamiento procesal civil orientada a promover una solución justa, rápida y económica de todo litigio.

Ahora bien, en cuanto al planteamiento sobre la confidencialidad y naturaleza privilegiada de las reservas de pérdida, Triple-S argumenta que la información sobre las reservas de pérdidas y el expediente de suscripción, por su propia naturaleza, constituyen información confidencial al amparo del Art. 53.080 del Código de Seguros, *supra* y, además, un secreto comercial según la Regla 513 de las Reglas de Evidencia, *supra*. En la alternativa, la peticionaria plantea –**por primera vez en esta etapa procesal**– que la información sobre las reservas se encuentra protegida por el privilegio del producto del trabajo (*work product*).

De entrada, en cuanto a este último planteamiento, es preciso señalar que del expediente no surge que la peticionaria lo haya esbozado ante el Tribunal de Primera Instancia ni en su recurso en oposición al Tribunal de Apelaciones. Por tanto, es norma reiterada que nos encontramos impedidos de evaluar los méritos de tal asunto, ya que no fue planteado por la parte, ni considerado anteriormente por un tribunal inferior. Véase Sánchez Ruíz v. Higueras Pérez *et al*., 203 DPR 982, 993 (2020).

Por otro lado, conforme al marco legal aplicable, la confidencialidad y el carácter privilegiado del Informe sobre ORSA y sus respectivos anejos se deriva de una disposición legal expresa, así como de una política pública clara dirigida a proteger el análisis estratégico de gestión de riesgos de las aseguradoras. En consecuencia, dado que el Art. 53.080 del Código de Seguros, *supra*, está específicamente orientado al análisis global de solvencia del asegurado, concluimos que la protección de confidencialidad dispuesta en dicha disposición **no se extiende automáticamente** a otras categorías de información, como el expediente de suscripción de la póliza o las reservas de pérdidas establecidas en el curso regular de los negocios.

Respecto al carácter confidencial de la Reserva de Pérdida en virtud del privilegio de secretos del negocio, resolvemos que Triple-S no objetó ni fundamentó adecuadamente todos los elementos necesarios del privilegio que reclama. Como señalamos previamente, para que una parte pueda excluir información del descubrimiento de prueba al amparo de un privilegio, debe invocar **de forma oportuna, expresa y fundamentada** especificando la naturaleza de los documentos u objetos no producidos. Debe hacer lo anterior, de forma que, sin revelar la información privilegiada, se pueda evaluar la aplicabilidad del privilegio.

Sin embargo, no es factible concluir que la peticionaria cumplió con el estándar de preponderancia de la prueba requerido, pues no basta con formular una objeción, sin más, omitiendo demostrar todos los elementos del privilegio que alega. Por consiguiente, ante la ausencia de fundamentos específicos o de una disposición legal que declare confidencial o privilegiada la información sobre las reservas de pérdidas o suscripción, resolvemos que no puede extenderse por analogía la confidencialidad dispuesta en el Art. 53.080 del Código de Seguros, *supra*, así como tampoco aplica en este caso el privilegio de secreto comercial de la Regla 513 de las Reglas de Evidencia, *supra*.

No obstante, **resolvemos que el Tribunal de Primera Instancia actuó correctamente al denegar la solicitud del Consejo de Titulares para descubrir la información sobre la Reserva de Pérdida y el expediente de suscripción, por tratarse de evidencia impertinente.** En consecuencia, erró y abusó de su discreción el Tribunal de Apelaciones al expedir el recurso de *certiorari* y revocar de forma parcial la *Orden* del foro primario que declaró correctamente no ha lugar dicha solicitud de descubrimiento de prueba interpuesta por el Consejo de Titulares.

En conformidad con el derecho reseñado y a las circunstancias particulares del caso, disponemos que tanto las reservas de pérdidas como el expediente de suscripción carecen de pertinencia en el contexto de una reclamación

de cubierta bajo los términos de una póliza de seguro de propiedad. Así pues, aun cuando este Tribunal llegó a esta conclusión, lo anterior no implica que, en su día, de fundamentarse su pertinencia oportuna y adecuadamente, la información aquí solicitada pueda estar protegida de igual forma bajo algún privilegio. En definitiva, este tipo de información aquí no resulta relevante para probar que la aseguradora actuó con mala fe durante la investigación, ajuste y pago de la reclamación en cuestión.

## IV

Por los fundamentos antes expresados, se revoca la *Sentencia* emitida por el Tribunal de Apelaciones el 19 de diciembre de 2023, la cual revocó parcialmente la *Orden* dictada por el foro primario el 2 de septiembre de 2023. En consecuencia, se devuelve el caso al Tribunal de Primera Instancia para la continuación de los procedimientos en conformidad con lo aquí resuelto.

Se dictará *Sentencia* en conformidad.

ROBERTO FELIBERTI CINTRÓN
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Consejo de Titulares del Condominio Parques de Cupey; Attenure Holdings Trust 11; HRH Property Holdings<br><br>        Recurridos<br><br>        v.<br><br>Triple-S Propiedad, Inc.<br><br>        Peticionaria | CC-2024-96 | *Certiorari* |

SENTENCIA

En San Juan, Puerto Rico, a 15 de agosto de 2025.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente Sentencia, se revoca la *Sentencia* emitida por el Tribunal de Apelaciones el 19 de diciembre de 2023, la cual revocó parcialmente la *Orden* dictada por el Tribunal de Primera Instancia el 2 de septiembre de 2023. En consecuencia, se devuelve el caso al foro primario para la continuación de los procedimientos de acuerdo con esta *Opinión*.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Estrella Martínez emitió una Opinión Disidente. El Juez Asociado señor Colón Pérez emitió una Opinión Disidente. La Jueza Presidenta Oronoz Rodríguez disiente y se une a la Opinión Disidente del Juez Asociado señor Colón Pérez. El Juez Asociado señor Candelario López no interviene.


                        Javier O. Sepúlveda Rodríguez
                        Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Consejo de Titulares del Condominio Parques de Cupey; Attenure Holdings Trust 11; HRH Property Holdings<br><br>Recurridos<br><br>v.<br><br>Triple-S Propiedad, Inc.<br><br>Peticionaria | CC-2024-96 | *Certiorari* |

Opinión disidente emitida por el Juez Asociado Señor ESTRELLA MARTÍNEZ.

En San Juan, Puerto Rico, a 15 de agosto de 2025.

En el año 2017 aconteció el fenómeno atmosférico que dio lugar a la reclamación de daños de este pleito. Al presente, entiéndase, mediados del 2025, aún el caso se encuentra en la etapa procesal de descubrimiento de prueba y sin fecha calendarizada en el Tribunal de Primera Instancia para el inicio del juicio en sus méritos. Contrario al proceder mayoritario, opino que la solución más justa, rápida y económica era haber denegado el recurso de *certiorari* que presentó Triple-S Propiedad, Inc. (Triple-S o aseguradora) y, con ello, ordenado la continuación de los procedimientos en el foro primario. Ello, porque el Tribunal de Apelaciones resolvió correctamente cuáles asuntos superaban el alcance del

descubrimiento de prueba y cuáles eran descubribles, como el expediente de suscripción o *underwriting* y la información sobre las reservas de pérdidas.

Sin embargo, sostengo que el proceder mayoritario excluyó del descubrimiento de prueba información pertinente a las múltiples causas de acción y alegaciones generales del Consejo de Titulares del Condominio Parques de Cupey (Consejo de Titulares) y, a su vez, información pertinente a las defensas afirmativas que presentó Triple-S.

De igual manera, opino que el análisis -extremadamente restrictivo y categórico- que realizó el Tribunal, por voz de la mayoría, para prohibir el descubrimiento de prueba es inconsistente con la Regla 23.1 de Procedimiento Civil, *infra*, su jurisprudencia interpretativa y a la tendencia reiterada de la jurisprudencia angloamericana de permitir el descubrimiento dependiendo de los hechos del caso, especialmente ante alegaciones de que la aseguradora incurrió en mala fe. Por ello, estoy en la obligación de respetuosamente disentir del dictamen al que hoy arriba una mayoría de este Tribunal y procederé a explicar todos los fundamentos que sostienen mi postura.

I.

Ahora bien, antes de entrar en los méritos de mi disenso respecto al alcance del descubrimiento de prueba

aquí impugnado, debo destacar dos (2) asuntos que considero ameritaban un examen más minucioso por parte de este Tribunal.

En primer lugar, recordemos que la transacción extrajudicial es aquella que ocurre "antes de que comience el pleito que se quiere evitar, o cuando una vez comenzado, las partes acuerdan una transacción sin la intervención del tribunal". *Rodríguez et al. v. Hospital et al.*, 186 DPR 889, 904 (2012). En Puerto Rico existe una política pública a favor de que se transijan los pleitos sin tener que ir a los tribunales y llegar a un juicio. E.L. Chiesa Aponte, *Reglas de Evidencia Comentadas*, San Juan, Ediciones Situm, 2016, pág. 108. Las transacciones extrajudiciales son deseables desde cualquier perspectiva: ahorran tiempo y dinero a las partes involucradas en el litigio, descongestionan los calendarios judiciales y propenden al diálogo y a la paz entre los ciudadanos. *Carpets & Rugs v. Tropical Reps.*, 175 DPR 615, 630 (2009).

Conforme a lo anterior, surge del expediente que las partes han solicitado en varias ocasiones que se paralicen los procedimientos apelativos ante nos y se les conceda un término razonable para agotar las negociaciones transaccionales extrajudiciales. En específico, el 23 de julio de 2025, presentaron una moción conjunta con el fin de solicitar un término adicional de sesenta (60) días

para continuar las negociaciones e informaron al Tribunal sobre la calendarización de dos (2) fechas en el mes de agosto a esos fines. Sin embargo, sin razón para ello, una mayoría de este Tribunal determinó declarar no ha lugar la solicitud y se adelantó a notificar la *Opinión* sin considerar las repercusiones que ello muy probablemente implicará en el ánimo y la voluntad de las partes para continuar las conversaciones, y sin tomar en cuenta que, como una de las partes en este pleito es un Consejo de Titulares, la toma de decisiones en cumplimiento con las leyes y reglamentos aplicables a este organismo no ocurre de forma expedita. Considero que el proceder mayoritario es contrario a la política pública de fomentar que los pleitos se transijan, por lo que respetuosamente discrepo del mismo.

En segundo lugar, discrepo del curso mayoritario de adjudicar erróneamente la controversia respecto al descubrimiento del expediente de suscripción. De hecho, surge expresamente de la *Petición de certiorari* que Triple-S consignó que solamente recurría de la "decisión del Tribunal de Apelaciones de ordenar la producción de la información sobre las reservas" y que "[e]n esta ocasión particular, y sin renunciar a ningún derecho en otros casos, **Triple-S no recurre de la orden de producir información sobre suscripción**". (Negrillas suplidas). Véanse, *Petición de certiorari,* pág. 4, nota al calce 1;

*Alegato de Triple-S Propiedad, Inc*., pág. 5, nota al calce 1. De igual forma, surge con absoluta claridad de su súplica que Triple-S solo solicitó que se revisara de la *Sentencia* del Tribunal de Apelaciones "aquella parte en la cual se ordena la producción de información sobre reservas relacionadas con la reclamación presentada por el Condominio en el caso de título". Véanse, *Petición de certiorari,* pág.17; *Alegato de Triple-S Propiedad, Inc*., pág. 19. En ese sentido, de ordinario este Tribunal no entraría a adjudicar esa dimensión de la controversia.

Indistintamente de esa realidad, considero errado lo expresado en la *Opinión* mayoritaria en cuanto a que el expediente de suscripción no es descubrible por tratarse de evidencia impertinente en el contexto de una reclamación de una póliza de seguro de propiedad.

Más allá de todo esto, como adelanté, la médula de mi disenso es que tanto el análisis como los fundamentos utilizados por una mayoría de este Tribunal son inconsistentes con la Regla 23.1 de Procedimiento Civil, *infra*, con la jurisprudencia interpretativa que reconoce que los descubrimientos de prueba deben ser amplios y liberales y con el patrón recurrente en otras jurisdicciones de permitir el descubrimiento en controversias muy similares a la de epígrafe. Me explico.

La Regla 23.1 (a) de Procedimiento Civil, 32 LPRA Ap. V., establece los parámetros del descubrimiento de prueba

en los casos civiles. En específico, dispone que el descubrimiento de prueba solo está sujeto a dos limitaciones principales: (1) que la información objeto del descubrimiento no sea privilegiada y (2) que la información sea pertinente a la controversia. *Cruz Flores et al. v. Hosp. Ryder et al.*, 210 DPR 465, 471 (2022); *McConnell v. Palau,* 161 DPR 734 (2004).

En lo que aquí nos concierne y en palabras sencillas, la pertinencia significa que la prueba tiene una **relación lógica con los hechos que se quieren establecer en el caso**. R. Hernández Colón, *Práctica jurídica de Puerto Rico, Derecho procesal civil*, 6ta Ed., LexisNexis, San Juan, pág. 493. Al respecto, serán descubribles todos aquellos asuntos **-sean o no admisibles en el juicio bajo las reglas de admisibilidad de evidencia- que puedan tener cualquier relación posible con la materia que es objeto del pleito, aunque no estén relacionadas con las controversias específicas que se esbozaron en las alegaciones**. *Íd.,* pág. 494; *Sierra v. Tribunal Superior*, 81 DPR 554, 573 (1959). Recordemos que, en materia procesal civil, el concepto de pertinencia para propósito del descubrimiento de prueba siempre se ha interpretado de una forma más amplia que el utilizado en las Reglas de Evidencia. *Rodríguez v. Scotiabank de P.R.,* 113 DPR 210, 212 (1982). Precisamente, para propósito del descubrimiento de prueba **bastará que exista una**

**posibilidad razonable de relación con el asunto en controversia**. *García Rivera et al. v. Enríquez*, 153 DPR 323 (2001). Véase, *E.L.A. v. Casta*, 162 DPR 1, 3 (2004).

En materia de derecho procesal civil, es una norma ampliamente reiterada que el descubrimiento de prueba debe ser **amplio y liberal**. *Rivera et al. v. Arcos Dorados et al.*, 212 DPR 194, 203, (2023); *Cruz Flores et al. v. Hosp. Ryder et al.*, *supra*; *Berríos Falcón v. Torres Merced*, 175 DPR 962, 971 (2009). Ahora bien, como vimos, conforme a la Regla 23.1 (a) de Procedimiento Civil, *supra*, la liberalidad del descubrimiento de prueba no excederá el ámbito de las materias privilegiadas ni de la pertinencia. Nada más. Similarmente, existe otro principio rector que protege nuestras reglas procesales y es la obligación de interpretarlas de forma que garanticen una solución justa, rápida y económica del caso. Regla 1 de Procedimiento Civil de 2009, *supra*. Para armonizar, al momento de limitar el descubrimiento de prueba de acuerdo con las reglas de procedimiento civil, los tribunales debemos hacer un balance entre estos dos intereses. *Rivera et al. v. Arcos Dorados et al.*, *supra*, págs. 203-204. Sin embargo, al realizar esta delicada labor, el tribunal adjudicador deberá tener presente que un amplio y liberal descubrimiento de prueba es "la médula del esfuerzo de destruir de una vez y para siempre la deportiva teoría de justicia" que tanto mina la fe del pueblo en el sistema

judicial. (Citas omitidas). *Aponte v. Sears Roebuck de P.R., Inc.,* 129 DPR 1042, 1049 (1992); *General Electric v. Concessionaires, Inc.*, 118 DPR 32, 38 (1986); *Ades v. Zalman,* 115 DPR 514, 517 (1984); *Rivera Alejandro v. Algarín*, 112 DPR 830 (1982).

Contrario al aparente hilo conductor principal de la *Opinión*, debemos tener presente que este caso no versa única y exclusivamente sobre un reclamo de mala fe por parte del Consejo de Titulares hacia Triple-S en la ejecución del contrato de seguros. En este pleito existen otras causas de acción con sus respectivas alegaciones generales que ameritan todo un descubrimiento de prueba amplio y liberal.

A modo de ejemplo, en su reclamo de daños en el inmueble, el Consejo de Titulares estima que los mismos ascienden a $14,706,508.49 menos deducibles y pagos adelantados. En su reclamación de manejo inapropiado de la reclamación por parte de Triple-S, el Consejo de Titulares alega que el ajustador de la aseguradora falló en documentar una porción sustancial de los daños, subvaloró los costos de reparación y violó los estándares aplicables. De manera similar, respecto al incumplimiento de contrato, sostiene que **Triple-S se rehusó a pagar y fracasó en realizar un ajuste consistente con sus obligaciones bajo la póliza**, por lo que le imputó actuar con dolo y mala fe al negarse a pagar la reclamación de

seguro. A su vez, alegó **dolo en la ejecución del contrato debido a que la aseguradora le realizó representaciones falsas sobre la cubierta, los términos y el alcance de la póliza para evadir el cumplimiento de sus obligaciones contractuales**. Véase, *Petición de certiorari, Apéndice,* págs. 7-8.

Por otro lado, en su contestación a la demanda, Triple-S argumentó entre sus múltiples defensas afirmativas que la reclamación que presentó el Consejo de Titulares estaba sobrevalorada, pues incluía daños exagerados, especulativos, infundados, **preexistentes e inexistentes**, además de contener alteraciones u omisiones de información y pruebas de apoyo, y **que la reclamación no se ajustaba a los términos y condiciones de la póliza.** Véase, *Apéndice de Triple-S Propiedad,* pág. 43. En particular, Triple-S sostuvo que la partida en daños contenía reclamaciones por daños que no fueron ocasionados por el huracán María y que el **Consejo de Titulares incurrió en fraude al presentar su reclamación con conocimiento de su falsedad.** *Íd.,* pág. 46. En atención a la valoración de los daños, la aseguradora sostiene que estos totalizan $78,787.04.

Como sabemos, el Consejo de Titulares solicitó como parte del descubrimiento de prueba que Triple-S indicara la cantidad de reserva o reservas de pérdidas asignada para la reclamación. Véase, *Petición de certiorari,*

*Apéndice,* pág. 60. Por su parte, la aseguradora se negó a producirla aduciendo que era información impertinente, sin posibilidad razonable de conducir a prueba admisible y protegida. *Íd.*, pág. 102.

Al resolver este asunto, la opinión mayoritaria determinó que la solicitud de los documentos sobre la reserva de pérdida es impertinente al litigio, por entender que no guarda relación posible con el "ajuste real de la reclamación ni constituye[,] en modo alguno, una admisión de responsabilidad por parte de la aseguradora". *Opinión*, pág. 40. En apoyo a esto, se expresó que "las alegaciones de mala fe y conducta dolosa no han sido debidamente fundamentadas en hechos concretos". *Íd.*, pág. 42. Sin embargo, opino que todas estas premisas resultan insostenibles.

Tal como se señaló, la pertinencia que se procura para el descubrimiento de prueba consiste en que lo solicitado tenga una relación lógica con los hechos que se quieren establecer en el caso o que exista una posibilidad razonable de relación con el asunto en controversia. En este caso, la controversia no se limita al "ajuste real de la reclamación", sino que abarca otras múltiples controversias de gran complejidad.

Como se desprende de las alegaciones generales del Consejo de Titulares y de las defensas afirmativas de la aseguradora, es evidente que en el presente pleito existe

una amplia divergencia de criterio y controversia entre las partes respecto al alcance e interpretación de la póliza, la causalidad de los daños al inmueble, la valorización y razonabilidad de estos daños, el manejo de la reclamación y el procedimiento utilizado para llevar a cabo el ajuste. Todas estas cuestiones, sin lugar a duda, como punto de partida, requieren ser descubiertas y, posterior a ello, tendrán que dirimirse en el juicio en su fondo.

Por ello, considero que la información sobre las reservas de pérdidas guarda una relación lógica con los hechos que se intentan establecer en el caso: que la aseguradora ha actuado con dolo en la negociación y al realizar el ajuste de la reclamación; que realizó representaciones falsas sobre la cubierta, los términos y el alcance de la póliza; y que actuó de mala fe al rehusarse a pagar una cantidad justa y razonable a los daños sufridos.

Además, es al extremo desacertado requerir "hechos concretos" en esta etapa de los procedimientos, a saber, durante el descubrimiento de prueba. Recordemos que uno de los propósitos del descubrimiento de prueba es **precisar las cuestiones en controversia, actuando como un mecanismo auxiliar a las alegaciones,** pues, como regla procesal, **estas últimas solo ofrecen una mera notificación general de los hechos esenciales a la reclamación o defensa**. R.

Hernández Colón, *op. cit.,* pág. 491 citando a *Sierra v. Tribunal Superior*, *supra*, pág. 560. Se procura, además, con el descubrimiento, aligerar el juicio y relevar a la parte del costo de probar hechos que no pueden ser disputados durante el juicio y cuya veracidad pueda ser establecida mediante el uso de medios de descubrimiento de prueba. A. Cuevas Segarra, *El descubrimiento de prueba en la práctica procesal civil puertorriqueña,* Barcelona, Bosch Editor, 2023, pág. 101 (citas omitidas). En ese sentido, no se puede demostrar con hechos concretos lo que aún no ha sido objeto de descubrimiento.

Ante ello, considero que es patentemente erróneo justificar la denegatoria bajo este análisis rígido y sin ninguna fuente normativa que avale requerir la presunta robustez de las alegaciones generales. ("En el régimen de derecho procesal puertorriqueño, el propósito de la demanda es bosquejar a grandes rasgos las reclamaciones que se hacen en contra de los demandados". *López v. Secretaria*, 162 DPR 345, 356 (2004)).

Paralelamente, considero desacertado fundamentar el rechazo al descubrimiento bajo la pretensión de que las reservas de pérdidas no constituyen admisiones y que, por ese motivo, no son descubribles. Estimo que estas consideraciones van dirigidas a cuestiones sobre la admisibilidad de la prueba y el valor probatorio, en lugar de considerar la procedencia de su descubrimiento bajo el

crisol estricto de pertinencia. Debemos recordar que la determinación de que cierta prueba es descubrible no implica una adjudicación sobre su admisibilidad ni sobre su valor. Véanse, *Oneok, Inc. v. National Union Fire Ins. Co.*, *supra*, pág. 5; *N. River Ins. Co. v. Greater New York Mut. Ins. Co.,* 872 F. Supp. 1411, 1412 (E.D. Pa. 1995). Más importante aún, y como vimos, en nuestro ordenamiento serán descubribles todos aquellos asuntos -sean o no admisibles en el juicio- que puedan tener cualquier relación posible con la materia que es objeto del pleito, aunque no estén relacionadas con las controversias específicas que se esbozaron en las alegaciones. R. Hernández Colón, *op. cit.,* pág. 494; *Sierra v. Tribunal Superior, supra*, pág. 573.

Del mismo modo, resulta preocupante el estándar o escrutinio de tres (3) pasos que la *Opinión* parece adoptar en nuestro ordenamiento para que los tribunales evaluemos el descubrimiento de prueba en los pleitos contra aseguradoras. Según se dispone, en distintas jurisdicciones de Estados Unidos la determinación de relevancia de las reservas de pérdidas deberá hacerse según un análisis de las circunstancias particulares de cada caso, a la luz de tres (3) elementos fundamentales: (1) los métodos o prácticas mediante los cuales las aseguradoras establecen las reservas de pérdidas; (2) la

naturaleza del caso; y (3) el propósito por el cual se solicita la información.

Sin embargo, con la inminente determinación en este caso de que los documentos sobre las reservas de pérdidas carecen de pertinencia en el contexto de una reclamación de cubierta bajo los términos de una póliza de seguro, opino que muy difícilmente podrá algún futuro litigante superar ese estándar y conseguir el descubrimiento de estos. Por ejemplo, ¿cómo podrá el solicitante del descubrimiento o el Tribunal considerar el método o las prácticas utilizadas por la aseguradora demandada para establecer sus reservas de pérdidas, si precisamente esa es la información que se procura descubrir?

Por otra parte, soy del criterio de que, para propósitos del análisis de pertinencia, es irrelevante e inmaterial que la información sobre las reservas de pérdidas se haya creado para cumplir con requisitos estatutarios o regulatorios o como parte de sus obligaciones ordinarias, como intenta sostener la *Opinión*. A todas luces, si la información no está protegida por algún privilegio, como en este caso, el único análisis restante debe ser su pertinencia a las controversias entre las partes y no debe confundirse el análisis en consideraciones particulares respecto al propósito por el cual la información se generó.

Si bien las reservas de pérdidas obedecen al interés del estado de supervisar la condición económica de las aseguradoras, estas se crearon para, entre otras cosas, "ayudar a garantizar que los tenedores de pólizas y reclamantes reciban en su día los beneficios pactados en dichas pólizas, cuando muchas veces las mismas fueron vendidas años o décadas antes de que los beneficios sean reclamados y pagados". Exposición de motivos, Ley Núm. 90-2003.

En cuanto a esto, "[l]as reservas de perdida constituyen el estimado que mejor puede reflejar lo que el asegurador eventualmente tenga que pagar para transigir la pérdida". R. Cruz, *Derecho de seguros*, San Juan, Publicaciones JTS, 1999, pág. 403. Es decir, la reserva de pérdidas procura que los asegurados que insten una reclamación reciban el pago correspondiente bajo los términos pactados. Afirmo que resulta difícil justificar la no pertinencia de esta información en este caso, que a todas luces se creó en nuestro ordenamiento como una garantía adicional de protección para el asegurado y, particularmente, a la luz de las múltiples controversias de hecho y de derecho que tendrán que dilucidarse en el foro primario. Sin lugar a duda, "la tendencia moderna en el ámbito del procedimiento civil es a facilitar el descubrimiento de prueba de forma tal que se coloque al juzgador en la mejor posición posible para resolver

justamente". *Scotiabank v. ZAF Corp. et al.*, 202 DPR 478, 491, (2019); *E.L.A. v. Casta, supra*, pág. 9.

En otro extremo, en materia de contratos de seguros, las controversias deben ser resueltas en atención al Código de Seguros de Puerto Rico y la jurisprudencia interpretativa. *SLG Albert-García v. Integrand Asrn.*, 196 DPR 382, 389 (2016). Como corolario de ello, las disposiciones del Código Civil de Puerto Rico tienen una función supletoria por tratarse de una materia reglamentada por una ley especial. *San Luis Center Apts. et al. v. Triple-S*, 208 DPR 824, 832 (2022). En último extremo, se acudirá a la jurisprudencia angloamericana por su valor persuasivo. *SLG Albert-Garcia v. Integrand Asrn., supra; CSMPR v. Carlo Marrero et als.,* 182 DPR 411, 424 (2011). Como bien reconoce la *Opinión*, el Código de Seguros de Puerto Rico, 26 LPRA sec. 1.010 *et seq.*, no establece que las reservas de pérdidas constituyen información confidencial o que están excluidas automáticamente del descubrimiento de prueba en un litigio civil por estar cubiertas por algún privilegio.

Sin embargo, para arribar al resultado de completa exclusión, la mayoría recurre exclusivamente a jurisprudencia angloamericana persuasiva que **demuestra con claridad que los tribunales federales y estatales están divididos en cuanto a si las reservas de pérdidas deben estar sujetas al descubrimiento de prueba**. Véanse,

*Consugar v. Nationwide Ins. Co. of America*, 2011 WL 2360208 (M.D. Pa. 2011); *Silva v. Basin Western, Inc.,* 47 P.3d 1184 (Colo. 2002).

Ahora bien, respecto a controversias en que se le imputa mala fe a una aseguradora, no hay tal división sino una inclinación de esos foros a reconocer que las reservas de pérdida son descubribles.  Contrario a lo expuesto en la opinión mayoritaria, la realidad es que existe cierta inclinación a reconocer que: (1) las reservas de pérdidas pueden ser relevantes y descubribles, especialmente en casos en que se le imputa mala fe a una aseguradora. *Lipton v. Superior Court,* 48 Cal. App. 4th 1599 (Cal. App. 2 Dist., 1996); (2) el hecho de que una reclamación sea de primera parte no significa que sea un caso evidente de cobertura y que, por ello, las reservas no sean descubribles, menos todavía si es de mala fe. Véanse, *Bernstein v. Travelers Ins. Co.*, 447 F. Supp. 2d 1100, 1105 (N.D. Cal. 2006); *Spahr v. Amco Insurance Company*, 2010 WL 11459909 (C.D. Cal., 2010); (3) la relevancia de la información de reservas depende de los factores únicos presentados en cada caso, tales como el método para calcular la reserva, la naturaleza del litigio y el propósito por el cual se solicita descubrir la información. *State ex rel. Erie Ins. Property & Cas. Co. v. Mazzone,* 625 S. E. 2d 355, 359-360, 218 W.Va. 593, 598 (W.Va. 2005); (4) los casos en los que se podría permitir

el descubrimiento no se limitan a aquellos en los que la aseguradora no transigió una reclamación según los términos de la póliza de seguro; y (5) las reservas están sujetas al mismo estándar de relevancia aplicable a otra prueba en el contexto del descubrimiento. *Silva v. Basin Western, Inc., supra*, pág. 1189.

Así, por ejemplo, en el caso normativo de *Lipton v. Superior Court, supra,* fue determinante la imputación de mala fe a la aseguradora para que se permitiera el descubrimiento de prueba sobre las reservas de pérdidas. En particular, que esta información era relevante porque, entre varios asuntos, podía demostrar el estado mental de la aseguradora en cuanto al manejo de la reclamación y su conocimiento respecto a los múltiples límites de la póliza. ("Without doubt such information would assist Lipton in evaluating his bad faith case and in preparing it for trial. That is enough to justify discovery". *Lipton v. Superior Court, supra*, pág. 1616).

De igual forma, si bien el Tribunal en *Lipton* reconoció que la existencia de una reserva no puede considerarse como una admisión de responsabilidad o del valor de un reclamo, determinó que su descubrimiento pudiera ser relevante a una acción sobre mala fe, ello dependiendo de las alegaciones o las controversias presentadas. ("Thus, such evidence may or may not be relevant in a subsequent bad faith action, depending on

the issues presented"). *Íd.*, pág. 1614. Además, fue determinante que los argumentos en contra del descubrimiento de la prueba se circunscribían a cuestiones relativas a la admisibilidad de la prueba y que, para propósitos del descubrimiento, la información sobre las reservas de pérdida no podía ser considerada, *a priori*, irrelevante. *Íd.*, pág. 1605.

Este proceder a favor del descubrimiento en *Lipton* ha sido reiterado por otras jurisdicciones. A modo de referencia, véanse: *Pin-Pon Corp. v. Landmark Am. Ins. Co.*, No. 20-14013-CIV, 2021 WL 4991247 (S.D. Fla. Mar. 31, 2021); *Fay Ave. Props., LLC v. Travelers Prop. & Cas. Co. of Am.*, No. CIV. 11-2389-GPC WVG, 2014 WL 1333669 (S.D. Cal. Apr. 2, 2014); *Bernstein v. Travelers Ins. Co.*, *supra; Mauna Kea Resort, LLC v. Affiliated FM Insurance Company,* No. CV 07-00605 DAE-KSC, 2009 WL 10677143 (D. Haw. Mar. 3, 2009); *Yamagata Enters., Inc. v. Gulf Ins. Co.*, No. 207CV00644HDMGWF, 2008 WL 11388696, at 5 (D. Nev. Feb. 4, 2008); *Beattie v. Provident Life and Accident Insurance Company*, 2005 WL 8166041 (S.D. Cal., 2005).

En R*iverfront Landing Phase II Owners' Ass'n for assignee of Charles Gil Peckham & GT Framing v. Assurance Co. of Am.*, No. C08-0656RSL, 2008 WL 11344626 (W.D. Wash. Dec. 16, 2008), el Tribunal Federal del Distrito Oeste de Washington permitió el descubrimiento de información de reservas, pues, a su juicio, eran relevantes debido a que

la estimación de la aseguradora del valor de la reclamación **podía conducir a evidencia sobre la razonabilidad de su investigación o arrojar luz sobre la credibilidad de su oferta de acuerdo**. En particular:

> [A]lthough some courts have deemed reserve information inadmissible at trial, the relevance inquiry at the discovery stage is broad enough to allow discovery of reserve amounts [...] Defendant's attempt to preempt the inquiry into its reserve policies through blanket assertions that the information is generic and not relevant to plaintiff's claim is inappropriate at the discovery phase; the purpose of this discovery probe is to determine the extent to which defendant's reserve amounts are claim-specific, which may or may not lead to admissible evidence of defendant's bad faith in handling plaintiff's claim. *Íd.*

Similarmente, *Mauna Kea Resort, LLC v. Affiliated FM Ins. Co.*, *supra*, se trató de una demanda a una aseguradora por mala fe, incumplimiento de contrato y enriquecimiento injusto. El Tribunal Federal del Distrito de Hawai permitió el descubrimiento porque una discrepancia entre la reserva y la valoración que la aseguradora le proveyó al demandante podría constituir **evidencia circunstancial** de mala fe, especialmente a la luz de que la parte allí demandante alegó $100 millones en daños, mientras que la aseguradora demandada adujo que el valor de la reclamación era menos de una cuarta parte de esa cantidad. También, se fundamentó en que la información **podría arrojar luz sobre la minuciosidad de la investigación de la reclamación, por ser pertinente a las alegaciones de mala fe en su manejo.**

Nótese que estos casos no se limitan a las alegaciones de mala fe por no transigir una reclamación a partir de los términos de la póliza. Por el contrario, presentan una variedad de circunstancias en las que procedió el descubrimiento según las diferentes implicaciones que podría tener la revelación de información sobre las reservas de pérdidas, a partir de las alegaciones de los demandantes asegurados. Por ello, al evaluar esta jurisprudencia, soy del criterio de que en este caso nada nos impedía adoptar igual proceder y, con ello, determinar que las reservas de pérdidas son pertinentes en controversias como la de autos. Esto, sin duda, hubiese permitido al Consejo de Titulares sustentar las alegaciones generales de la demanda, particularmente cuando en nuestro ordenamiento la buena fe se presume y quien reclama la mala fe tiene el deber de probarla. *Feliciano Aguayo v. MAPFRE*, 207 DPR 138, 191 (2021). Véanse, además, *Groben v. Travelers Indem. Co.,* 49 Misc. 2d 14, 266 N.Y.S. 2d 616, 619 (N.Y. Sup. Ct. 1965) (finding "[b]ad faith is a state of mind which must be established by circumstantial evidence" and to this extent "[t]he actions of the ... [insurance company regarding reserves] are relevant."); *Oneok, Inc. v. National Union Fire Ins. Co.*, *supra*, pág. 2. Por esto, considero que su exclusión en este caso está reñida con la interpretación amplia del concepto de pertinencia para propósitos del descubrimiento

de prueba. ("Al referirnos a la pertinencia, debemos interpretarla de manera amplia". *McNeil Healthcare v. Mun. Las Piedras II*, 206 DPR 659, 674 (2021); *E.L.A. v. Casta*, *supra*, pág. 12; *General Electric v. Concessionaires, Inc.*, *supra*, pág. 40).

Por otro lado, abona en mi disenso que en este caso la parte que nos solicita el descubrimiento de prueba es el Consejo de Titulares y que, por la naturaleza de los contratos de seguros, suscribió un contrato de adhesión con Triple-S en el que aceptó un contenido y unos términos prediseñados redactados por el asegurador. Véanse, *San Luis Center Apts. et al. v. Triple-S*, *supra*, pág. 833; *Feliciano Aguayo v. MAPFRE*, *supra*, pág. 151; Art. 1248 del Código Civil de 2020, 31 LPRA sec. 9802.

Si bien reconozco que la controversia puntual ante nos no trata sobre la interpretación contractual, es importante tener presente que existe una norma ampliamente reconocida en nuestro ordenamiento en cuanto a la interpretación liberal en beneficio del asegurado cuando las cláusulas del contrato sean dudosas o ambiguas. Sostengo que, como foro de mayor jerarquía, nada nos impedía en este caso ser consecuentes y aplicar un mismo estándar de liberalidad en torno al descubrimiento de prueba solicitado por una parte asegurada que suscribió un contrato de adhesión. Sin duda, la Regla 23.1 (a), *supra,* y su jurisprudencia en cuanto a un descubrimiento

amplio y liberal nos proveían el marco jurídico para ello. Particularmente, cuando es evidente que la información requerida en este caso no está protegida por ningún privilegio y es pertinente a la controversia.

Al respecto, reseño además que, en la *Demanda* del Consejo de Titulares, una de las alegaciones generales es que la aseguradora incurrió en prácticas desleales de conformidad al Art. 27.161 del Código de Seguros de Puerto Rico. Véase, *Petición de certiorari, Apéndice,* págs. 8-9. En este artículo se dispone que constituye una práctica desleal el "[o]bligar a los asegurados o reclamantes a entablar pleitos para recobrar bajo los términos de una póliza, **porque se le ha ofrecido al asegurado o reclamante una cantidad sustancialmente menor que la cantidad que podría ser recobrada finalmente en un litigio o porque se le ha negado incorrectamente la cubierta bajo los términos de la póliza**". Art. 27.161, 26 LPRA sec. 2716a(7).

Sobre este particular, estimo que el descubrimiento de la información sobre las reservas bien pudiera ayudar al juzgador de hechos en el foro primario a determinar si la cifra ajustada por la aseguradora resultó ser irrisoria y en contravención a los términos de la cubierta. Al mismo tiempo, le asistiría en determinar si el proceder de la aseguradora ante la reclamación denotó alguna intención de perjudicar o engañar al asegurado en violación a los términos del contrato. Después de todo, el contrato de

seguros está sujeto a un pacto implícito de buena fe y el asegurador tiene la obligación de actuar con consideración especial hacia los intereses del asegurado. *Consejo Titulares v. MAPFRE*, 208 DPR 761, 774 (2022) (citas omitidas). **Más importante aún, si bien como regla general la aseguradora responde por las pérdidas según los límites de responsabilidad pactados en la póliza, por excepción, en controversias como la de autos podría "ser responsable de pagar en exceso del límite de la cubierta cuando actúa en contra del pacto implícito de buena fe y antepone sus propios intereses a los del asegurado".** *Íd*. Entiéndase, cuando incurre en acciones u omisiones conocidas como prácticas desleales o fraudulentas, como lo sería el actuar de mala fe. *Íd*. Precisamente, si en este pleito aplica esta excepción, será una de las controversias medulares que el Tribunal de Primera Instancia tendrá que adjudicar y, sin duda alguna, para ello el descubrimiento solicitado es en extremo pertinente.

De otro modo y según advertí, si bien considero que el curso mayoritario erró al discutir en los méritos el asunto respecto al descubrimiento del expediente de suscripción, el cual nunca estuvo ante nuestra consideración, considero que igualmente falló en dictaminar que estos son impertinentes a la controversia. Antes de explicar la razón de mi disenso en este aspecto, y en términos sencillos, la suscripción es el proceso

mediante el cual una aseguradora examina las solicitudes, evalúa el negocio con el posible asegurado, acepta o rechaza el riesgo y clasifica los riesgos aceptables con el fin de cobrar una prima adecuada. Véase, Scott S. Spearing, Patrick T. Ryan, *Fidelity Insurance Underwriting-What Is in the Underwriter's File and How Is It Used?,* 58 Tort Trial & Ins. Prac. L.J. 1, 3 (2023).

Como sabemos, en su pliego de interrogatorios, el Consejo de Titulares requirió que se identificara cada política o proceso establecido por Triple-S previo a otorgar una póliza de seguros, y si la propiedad que ha de asegurarse debía ser inspeccionada como parte del proceso de *underwriting*. A su vez, solicitó que se describiera cómo se realiza dicha inspección, quiénes la llevaron a cabo y cuál era el proceso de documentación. Similarmente, solicitó que Triple-S describiera la condición del inmueble asegurado al momento de renovarse la póliza, que incluyera las fotos o los videos relacionados con dicha condición y que indicara si hubo un proceso de reinspección. Véase, *Petición de certiorari, Apéndice,* pág. 59. Por su parte, Triple-S objetó el descubrimiento bajo el fundamento de que no estaba en controversia la existencia de la póliza, sus términos o condiciones y porque la información no era pertinente y estaba protegida como secreto de negocio. *Íd.*, pág. 178.

Adviértase que una de las defensas afirmativas que levantó Triple-S es que los daños reclamados son preexistentes al paso del huracán María y que el Consejo de Titulares incurrió en fraude y falsas reclamaciones sobre sus pérdidas. En ese sentido, contrario al dictamen mayoritario, sostengo que la información contenida en el expediente de suscripción -a saber, el proceso que la aseguradora empleó al otorgar o renovar la póliza para evaluar su riesgo, incluyendo posibles inspecciones o documentación sobre la condición previa de la propiedad- es información pertinente que amerita su descubrimiento. Evidentemente, **existe una posibilidad razonable de que esta información se relacione con múltiples asuntos en controversia: la causalidad de los daños, el alcance de la cubierta y, como consecuencia directa, la valoración de los daños. Al mismo tiempo, el Consejo de Titulares alegó que Triple-S le hizo representaciones falsas sobre la cubierta, los términos y el alcance de la póliza.**

Aún más, la mencionada información muy probablemente permitirá conocer si la aseguradora cumplió con el procedimiento ordinario al momento de realizar la suscripción de la cubierta y establecer sus términos o si, por el contrario, incurrió en dolo en la negociación, al hacer falsas representaciones y/o en mala fe en la tramitación del ajuste. Ello, sin duda, permitirá al Consejo de Titulares sustentar las alegaciones generales

de la demanda. En ese sentido, soy de la opinión de que no se puede negar el descubrimiento de esta información bajo la liviana teoría de que no existe controversia sobre la existencia de la póliza y su vigencia. En ese extremo, me opongo al proceder mayoritario de aumentar y pasar por alto el estándar de pertinencia de una mera posibilidad razonable o relación lógica, al dictaminar que el Consejo de Titulares falló en demostrar que la información tiene una "relación sustancial" con el procedimiento judicial incoado y, con ello, justificar la denegatoria del descubrimiento solicitado. Sin duda, ello es contrario a nuestra tan arraigada norma de amplitud y liberalidad en el descubrimiento de todo aquello que sea pertinente a los hechos y las controversias.

Adviértase que múltiples tribunales federales y estatales han autorizado el descubrimiento de prueba de los documentos de *underwriting* en controversias similares a la de autos. Véanse, *Int'l Game Tech. v. Ill. Nat'l Ins. Co.,* 2017 WL 5505039 at 2 (D. Nev. Nov. 16, 2017) ("The relevancy of underwriting and policy drafting history information is not exclusive to cases that involve bad faith claims"); *Renfrow v. Redwood Fire & Cas. Ins. Co.,* 288 F.R.D. 514, 521 (D. Nev. 2013) (los documentos de suscripción son relevantes a alegaciones de incumplimiento contractual y mala fe); *Olin Corp. v. Cont'l Cas. Co.,* 2011 WL 3847140, 2-3, 2011 U.S. Dist.

LEXIS 98177, 9-10 (D. Nev. Aug. 30, 2011) (los documentos de suscripción son relevantes y descubribles en casos de incumplimiento de contrato porque explicaría qué incluía la póliza y si la aseguradora incumplió su obligación). En ese último, se estimó que los documentos de suscripción eran relevantes a las defensas afirmativas de la aseguradora de que el asegurado incumplió términos de la póliza y que la controversia no estaba cubierta.

Por ejemplo, *Park v. State Farm Fire & Cas. Co.*, No. 2:23-CV-01564-TL, 2024 WL 4494877 (W.D. Wash. Oct. 15, 2024), se trató de un caso de primera parte con alegaciones de mala fe, similar al de epígrafe. En este, la parte demandante reclamó a la aseguradora en virtud de una póliza de seguro de vivienda de alquiler luego de que la propiedad asegurada sufriera daños. Le imputó a la aseguradora incumplimiento de contrato, mala fe y múltiples violaciones a las leyes de Washington y alegó que la aseguradora manejó mal la reclamación, lo cual resultó en la denegatoria de cobertura y beneficios. En el descubrimiento de prueba, solicitó la producción de "The Complete Underwriting File ... referring or relating in any way to the Policy at issue in this case". La parte demandante arguyó que los documentos eran relevantes y podían ayudar a determinar en qué medida la suscripción de la póliza consideró adecuadamente los riesgos asociados a asegurar la propiedad. Por su parte, la aseguradora

argumentó que los documentos eran inútiles para efectos del litigio porque fueron generados con anterioridad a cualquier evento que diera paso a la demanda y denunció que la solicitud fue presentada con el único propósito de causar molestias, acosar y sobrecargar a la aseguradora con gastos indebidos. El Tribunal Federal del Distrito Este de Washington permitió el descubrimiento de documentos de suscripción, razonando que la parte demandante cumplió con el peso de establecer la relevancia de los documentos y que la aseguradora no cumplió con el fuerte peso de demostrar por qué debía ser denegado.

Por otra parte, de nuevo -contrario al curso mayoritario- sostengo que la información sobre el expediente de suscripción y las reservas de pérdidas está bajo el control de Triple-S y que, por ello, puede ser fácilmente descubierta. Su producción no implica ninguna carga, perturbación, onerosidad o gasto indebido que justifique su exclusión. Debemos tener extremo cuidado de que, bajo el alegado escudo de procurar otorgar una solución justa, rápida y económica a los pleitos, se vulneren los derechos procesales de algunas de las partes. Al respecto, hemos expresado que limitar innecesariamente el acceso al descubrimiento de prueba **puede dar lugar a que se transgreda el debido proceso de ley**, incluyendo la garantía constitucional a tener un proceso justo. *RMCA v. Mayol Bianchi*, 208 DPR 100, 102 (2021).

Esto, porque las reglas que rigen el descubrimiento de prueba "se basan en el concepto básico de que antes del juicio toda parte en la litigación tiene el derecho a obtener el descubrimiento de toda la información que esté en posesión de cualquier persona". *Íd.*, págs. 112-113, (citando a J.A. Cuevas Segarra, *Tratado de derecho procesal civil,* 2da ed., Pubs. JTS, 2011, T. II, pág. 835). En este caso, el tratamiento más justo, rápido y económico era, en primer lugar, haberles otorgado a los litigantes el término solicitado para continuar las conversaciones transaccionales y, en segundo lugar, haber dado primacía al interés de garantizar un descubrimiento amplio y liberal sobre las materias pertinentes.

II.

Finalmente, soy del criterio de que el resultado de este caso, al excluir del descubrimiento de prueba el expediente de suscripción de la póliza y las reservas de pérdidas, además de no observar la amplitud y liberalidad del descubrimiento de prueba, es contrario a la política pública que procura la protección de los asegurados mediante un remedio judicial en situaciones como la de autos. En específico, la Asamblea Legislativa de Puerto Rico consideró que la respuesta de la industria de los seguros ante el paso de los huracanes Irma y María en septiembre de 2017 estuvo "plagada de retrasos, mal manejo y de reiteradas violaciones a las disposiciones de nuestro

Código de Seguros". Véase Exposición de Motivos de la Ley Núm. 247-2018. Ante ello, se promulgó la Ley Núm. 247-2018 para "brindar herramientas y protecciones adicionales en beneficio de los asegurados para garantizar el fiel cumplimiento de los fines del Código de Seguros y así agilizar el proceso de recuperación de Puerto Rico". *Íd.*

En ese extremo, al considerar la naturaleza de este caso, los intereses en disputa, sus circunstancias particulares y el propósito por el cual el Consejo de Titulares solicitó la información, opino que debimos inclinar la balanza a favor del descubrimiento de la prueba. Y es que, al momento de llenar un vacío interpretativo, como la descubribilidad de la información aquí en disputa, la integración armoniosa de nuestro derecho procesal civil y la jurisprudencia en materia de seguros nos debían conducir a validar el descubrimiento de esta prueba. De esta manera, este Tribunal hubiese cumplido con el designio intrínseco de la póliza de seguros de darle protección al asegurado y, con ello, hubiese reiterado el estándar de descubrimiento amplio y liberal que rige los procedimientos civiles.

Como hemos visto, no existía ninguna barrera para basar nuestro resultado en los principios de justicia y razonabilidad. La Regla 23.1(a) de Procedimiento Civil, *supra*, no permitía la interpretación al extremo restrictiva y excepcional a la que arribó la mayoría. La

*Opinión* minimiza y soslaya la tendencia reiterada de permitir el descubrimiento, especialmente ante alegaciones de que la aseguradora incurrió en mala fe. Por este curso de acción ser contrario al Derecho aquí expuesto, respetuosamente disiento.


                                    Luis F. Estrella Martínez
                                          Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Consejo de Titulares del Condominio Parques de Cupey; Attenure Holdings Trust 11; HRH Property Holdings<br><br>Recurridos<br><br>v.<br><br>Triple-S Propiedad, Inc.<br><br>Peticionaria | CC-2024-0096 | *Certiorari* |

Opinión Disidente emitida por el Juez Asociado SEÑOR COLÓN PÉREZ a la que se une la Jueza Presidenta ORONOZ RODRÍGUEZ

En San Juan, Puerto Rico, a 15 de agosto de 2025.

Hoy, una mayoría de mis compañeras y compañeros de estrado, al optar por atender la causa de epígrafe en sus méritos, -- sin un fundamento en derecho que valide su proceder --, limitan la prerrogativa que históricamente habían tenido las partes en un litigio de poder llegar a determinados acuerdos transaccionales que evitasen la provocación de cierto pleito o pongan fin a uno ya comenzado, sin la intervención de un tribunal.[1] Al así actuar, éstas y éstos, *sub silentio*, desvirtúan el contenido de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, y debilitan la sólida política pública que hasta este momento existía en nuestra jurisdicción, la cual

---

[1] **En lo relacionado a la última *Moción informativa conjunta sobre conversaciones transaccionales* que se presentó en el caso de marras, precisa señalar que la misma fue despachada muy someramente, y sin análisis legal alguno, -- obviando así importantes postulados que, sobre la figura jurídica de la transacción, por años han gobernado el derecho procesal civil puertorriqueño --, en las páginas 11 a la 14 de la *Opinión del Tribunal*.**

fomentaba el diálogo entre las partes como mecanismo para propiciar una sociedad menos litigiosa. **Con tan sinsentido proceder, no podemos estar de acuerdo.**[2] Explicamos porqué.

I.

En el presente caso, Triple-S Propiedad, Inc. (en adelante, Triple-S) presentó ante este Alto Foro determinado recurso de *Certiorari*. En este, nos solicitó la revisión de cierta *Sentencia* dictada por el Tribunal de Apelaciones, que revocó parcialmente una *Orden* emitida por el Tribunal de Primera Instancia, mediante la cual el foro primario había denegado una solicitud por parte del Consejo de Titulares del Condominio Parques de Cupey que buscaba que Triple-S descubriera ciertos documentos que entendían eran relevantes a su reclamación por incumplimiento de contrato, y de daños y perjuicios, en contra de la referida aseguradora. Empero, expedido el recurso presentado ante este Tribunal, las partes con interés en el litigio que nos ocupa decidieron iniciar conversaciones transaccionales y así lo informaron a este Alto Foro.

Sobre este extremo, dichas partes, en tres (3) ocasiones, -- en los días 25 de septiembre de 2024, 4 de noviembre 2024 y el 26 de diciembre de 2024 --, solicitaron a este Tribunal que paralizara los procedimientos

---

[2] Ello se agrava aún más, si tomamos en consideración que, en una práctica ajena al funcionamiento del Tribunal cuando se encuentra en Salas de Verano, y para disponer del presente caso de la manera más rápida posible, una mayoría de este Tribunal decidió acortar todos los términos reglamentarios que las juezas y los jueces que componemos este Alto Foro tenemos para votar y/o expresarnos en cuanto a determinado asunto.

relacionados a la causa de epígrafe, ello en aras de resolver su pleito extrajudicialmente. Tales solicitudes fueron concedidas mediante las debidas *Resoluciones*, bajo el mandato de que nos mantuvieran informados sobre el estatus de dichas conversaciones, directrices que aquí se siguieron.[3]

Ahora bien, al no poder alcanzar un acuerdo, el 26 de febrero de 2025 las partes con interés en el presente litigio nos solicitaron que se continuaran los procedimientos relacionados con la causa de epígrafe. **No obstante, estas últimas expresaron que existía la posibilidad de que eventualmente se retomaran las conversaciones transaccionales.** Tal petitorio fue declarado *ha lugar* mediante *Resolución* el 28 de marzo de 2025.

Así pues, tal y como nos lo habían adelantado, el 23 de julio de 2025, por cuarta ocasión, las partes con interés en el presente litigio sometieron ante este Alto Foro una nueva *Moción informativa conjunta sobre conversaciones transaccionales*. **En ésta, estas últimas nos informaron que habían retomado sus esfuerzos transaccionales, y que, a esos efectos, habían coordinado unas reuniones para el 21 y 22 de agosto de 2025, con la intención de poder disponer del presente pleito. Consecuentemente, las partes con interés en el presente litigio nos peticionaron que paralizásemos los procedimientos ante este Tribunal por un término de sesenta (60) días para permitirles continuar las negociaciones pertinentes.**

---

[3] Véase, *Resolución* de 3 de octubre de 2024, 7 de noviembre de 2024 y 9 de enero de 2025.

Como ya adelantamos, al día siguiente de presentarse la mencionada moción, en un esfuerzo atropellado por disponer de la controversia ante nos, una mayoría de este Tribunal, echando a un lado la petición de estas últimas, optó por disponer apresuradamente de la causa de epígrafe en sus méritos. De este lamentable proceder, como mencionamos anteriormente, disentimos. Procedemos, pues, a exponer las razones que nos mueven a ello.

## II.

Como es sabido, los acuerdos transaccionales son aquellas conversaciones que se dan entre las partes en un litigio "mediante el cual [estas últimas], dando, prometiendo o reteniendo cada una alguna cosa, evitan la provocación de un pleito o ponen fin a uno ya comenzado, con el propósito de evitar los pesares que conllevaría un litigio." *Betancourt González v. Pastrana Santiago*, 200 DPR 169, 184 (2018); *Municipio de San Juan v. Prof. Research*, 171 DPR 219, 238 (2007); *López Tristani v. Maldonado*, 168 DPR 838, 846 (2006). Conforme se ha establecido en nuestra jurisprudencia, para entrar en este tipo de conversación, -- bien sea judicial o extrajudicialmente --, deben concurrir los siguientes elementos: (1) una controversia o relación jurídica incierta litigiosa; (2) la intención de las partes de eliminar o superar esa controversia; y (3) concesiones recíprocas. *Berkan y otros v. Mead Johnson Nutrition Puerto Rico, Inc.*, 204 DPR 183, 205 (2020); *Rodríguez Ramos, et. al.*

*v. Hospital Dr. Susoni Inc., et. al.*, 186 DPR 889, 902 (2012); *Municipio de San Juan v. Prof. Research, supra,* pág. 239.

Así pues, estando presentes los precitados elementos, en innumerables ocasiones hemos sentenciado que los tribunales están llamados a facilitar el diálogo entre las partes litigantes con el propósito de que éstas realicen entre sí las negociaciones que estimen pertinentes. Véase, Regla 37.6 de las de Procedimiento Civil, 32 LPRA Ap. V., R. 37.6. Lo anterior, teniendo presente, claro está, que dichas conversaciones no necesariamente serán fructíferas de primera instancia. Véase, Regla 408 de las Reglas de Evidencia, 32 LPRA Ap. VI, R. 408. Ello pues, de ordinario, un proceso transaccional suele ser complejo, debido a que implica sacrificios mutuos de las partes para así evitar o finalizar sus controversias. *Carpets & Rugs Warehouses Inc. v. Tropical Reps & Distributors, Inc*. y otros, 175 DPR 615, 630 (2009); *US Fire Insurance Company y otros v. Autoridad de Energía Eléctrica y otros*, 174 DPR 846, 853 (2008); *López Tristani, v. Maldonado Carrero*, *supra*, pág. 859.

**En ese sentido, habiendo iniciado dichas conversaciones, no se debe penalizar, -- como hoy aquí se hizo --, a las partes que, en determinado litigio, y con la intención de poner fin a sus controversias, comienzan sus conversaciones, pero no llegan a un acuerdo prontamente. Ese calendario de trabajo, salvo situaciones de total displicencia, no debe ser controlado por un tribunal.**

Recordemos que en Puerto Rico existe [o existía hasta el día de hoy] una fuerte política pública a favor de este tipo de conversación entre las partes, pues entre otras cosas, ello promueve la economía procesal, descongestiona los calendarios judiciales, y propende al diálogo y a la paz entre las y los ciudadanos. *Berkan y otros v. Mead Johnson Nutrition Puerto Rico, Inc.*, *supra*, pág. 208; *Rodríguez Ramos, et. al. v. Hospital Dr. Susoni Inc., et. al.*, *supra*; *Carpets & Rugs Warehouses Inc. v. Tropical Reps & Distributors, Inc. y otros*, *supra*. Véase, además, Regla 408 de las Reglas de Evidencia, *supra*; Ernesto L. Chiesa Aponte, *Reglas de Evidencia Comentadas*, Ediciones Situm, 2016, pág. 108. De ello, precisamente, trataba el presente caso.

## III.

Y es que, en lo que respecta al asunto que hoy nos ocupa, las partes con interés en el presente litigio, --representadas todas por respetables abogados y abogadas que constantemente postulan ante nos, y que conocen bien la práctica procesal civil puertorriqueña y el funcionamiento de este Tribunal --,[4] mediante su última *Moción Informativa conjunta sobre conversaciones transaccionales,* oportunamente nos solicitaron que paralizásemos los procedimientos ante este Alto Foro, por un término de sesenta (60) días. Lo

---

[4] **En la causa de epígrafe comparecieron ante nos los licenciados Manuel Pietrantoni, Karena Montes y Hedy Nieves, en representación del Condominio Parque de Cupey y otros; y, los licenciados Luis Román (ex Procurador General de Puerto Rico), José Casillas, Celso Rivera y Frank Torres Viada, en representación de Triples-S Propiedad, Inc.**

anterior, según expresaron estas últimas en su escrito, con el interés de poder continuar los esfuerzos transaccionales que realizaban.

Si bien es cierto que, -- como mencionan la mayoría de mis compañeras y compañeros de estrado --, con anterioridad a dicha moción, ya le habíamos concedido varias oportunidades a las partes con interés en el presente litigio para que llevaran a cabo las negociaciones pertinentes, las cuales resultaron infructuosas en un primer intento, a nuestro juicio, eso de por sí, no era suficiente para declarar *no ha lugar* la nueva solicitud de prórroga presentada por estas últimas. Y, como consecuencia de ello, proceder a atender en los méritos el recurso ante nos.

Recordemos que se trata aquí de partes con interés en el litigio que, haciendo uso de la figura jurídica del acuerdo transaccional, según contemplada en el ordenamiento procesal civil puertorriqueño, constante y diligentemente han mantenido informado al Tribunal del estatus de sus conversaciones, y han cumplido con todos los requerimientos que le ha hecho este Alto Foro, a través de las distintas *Resoluciones* que se han emitido en el presente caso.[5] El hacer un uso correcto y adecuado de dicho mecanismo no puede ser motivo de una sanción, *sub silentio*, como hoy lo determina una mayoría de mis compañeras y compañeros. **Después de todo, recordemos que, "[p]or pertenecer el Derecho procesal al Derecho público, la casi totalidad de sus preceptos o normas**

---

[5] Véase, *Resolución* de 3 de octubre de 2024, 7 de noviembre de 2024 y 9 de enero de 2025.

**son de estricto cumplimiento"**. Rafael Hernández Colón, *Práctica jurídica de Puerto Rico: derecho procesal civil*, 6ta ed., Ed. LexisNexis, 2017, pág. 9.

IV.

Es, pues, por lo fundamentos antes expuestos que el juez que suscribe hubiese permitido a las partes en el presente litigio el poder continuar con las conversaciones dirigidas a ponerle fin al presente litigio, sin la intervención de este Tribunal. Por ese no ser el curso de acción seguido por una mayoría de mis compañeras y compañeros de estrado, disentimos.


                                        Ángel Colón Pérez
                                          Juez Asociado